Norman COOPER; Barry Roseman, M.D., P.C. Profit Sharing Plan; Theodore Deconne; Michael Dennis; Michael Kessler, on behalf of themselves and a class of all others similarly situated, Plaintiffs–Appellants,

v.

Michael D. PICKETT; Merisel, Inc.; Robert F. Leff; David Wagman; James L. Brill; John J. Connors; John F. Thompson; Lehman Brothers; Robinson–Humphrey Company; Deloitte & Touche, Defendants–Appellees.

No. 95–55657.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 4, 1996.

Decided Aug. 8, 1997.

As Amended On Denial of Rehearing and Rehearing En Banc Jan. 30, 1998.

618

William S. Lerach, Milberg Weiss Bershad Hynes & Lerach, San Francisco, California, for plaintiffs-appellants.

Joseph P. Mascovich, Crosby, Heafey, Roach & May, Oakland, California; Hugh S. Wilson, Latham & Watkins, Los Angeles, California; Bruce G. Vanyo, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, California; Robert A. Meyer, Los Angeles, California, for defendants-appellees.

Before: FLETCHER, BEEZER, and KLEINFELD, Circuit Judges.

FLETCHER, Circuit Judge:

Norman Cooper, on behalf of a class of shareholders, appeals the district court's dismissal with prejudice of his second amended class action complaint, alleging securities law violations against Merisel, Inc., various Merisel officers and directors, and its accountants and underwriters. We reverse and remand.

### FACTS

Merisel, Inc. is the largest American publicly held wholesale distributor of computer hardware, software, and services. Merisel buys computer products in volume from manufacturers and then ships smaller quantities to mail-order houses, computer stores, and other resellers. In September 1993, Merisel announced that it would acquire the franchise operations of Computerland Corporation, which had numerous retail outlets. The acquisition gave Merisel the right to distribute IBM, Hewlett–Packard, Compaq, and Apple computers.

Merisel announced the Computerland purchase on February 1, 1994. On February 27, Merisel announced good year-end results from 1993, and stock analysts issued favorable reports on the company's prospects. Merisel's stock rose from $14 1/2 in late 1993 to a record high of $22 1/2 on March 24, 1994.

On March 25, 1994, Merisel announced that it had filed a registration statement for a common stock offering, with the object of raising funds to retire debt from the acquisition. Shortly before the planned offering, however, on May 9, 1994, Merisel announced that although its results for the first quarter of 1994 showed increased revenues, profit margins had fallen. Merisel's stock fell, and the company cancelled the stock offering. On June 7, Merisel announced that earnings for the second quarter of 1994 would be significantly below analysts' forecasts, and profit margins continued to decline. Merisel's stock plummeted from $17 1/2 to $8 per share.

Several plaintiffs immediately filed class actions and an amended consolidated complaint was filed on August 15, 1994. The defendants moved to dismiss, and the district court dismissed without prejudice on December 19, 1994. Norman Cooper, on behalf of all persons who purchased Merisel stock between November 8, 1993 through June 7, 1994 ("plaintiffs"), then filed a Second Consolidated and Amended Class Action Complaint (the "complaint"), seeking damages for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b–5 promulgated by the Securities and Exchange Commission ("SEC").[1] The complaint

---

1. Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5, adopted by the SEC in 1942, similarly provides

It shall be unlawful for any person, directly or indirectly, ...

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 CFR § 240.10b–5.

Section 20(a) provides:

named as defendants Merisel, six of its officers and directors, Merisel's accountants, Deloitte and Touche ("Deloitte"), and Lehman Brothers and Robinson–Humphrey Company, Inc., investment banks which served as co-lead underwriters of Merisel's 1992 public offering and were retained to underwrite the cancelled 1994 offering. Two individual securities analysts who worked for Lehman Brothers and Robinson–Humphrey were also named.

The complaint alleges that

> The ... defendants falsely presented the Company's current and future business prospects and prolonged the illusion of revenue and earnings growth by making it appear that the Company's revenue and earnings growth was strong and would continue, that it was successfully countering price competition and that its acquisition of Computerland was advantageous to the Company.

Among other purposes, the complaint alleges that the Merisel defendants wished to sell their Merisel stock at inflated prices, and to keep the stock price high so that the planned May 1994 public offering would raise enough money to defray the Computerland debt. The complaint identifies sales of Merisel stock at the inflated prices by four of the individual Merisel officers. The investment banks participated so that they would make "millions in fees and discounts" for underwriting the 1994 public offering.

The complaint describes Merisel's "scheme" as follows: Merisel officers, who communicated regularly with securities analysts, told the analysts that Merisel's business was strong and that the Computerland acquisition in early 1994 would increase Merisel's earnings per share. The analysts then repeated those representations in their favorable reports. Merisel then endorsed the reports by distributing them to potential investors, who relied on the favorable reports. Merisel also faxed an internal forecast of increasing 1994 earnings to a securities analyst.

In their regular conference calls with securities analysts, Merisel's officers predicted that the Computerland acquisition would boost Merisel's 1994 earnings, that demand was strong, and that Merisel's international operations were stabilizing and could be expected to be profitable in 1994. The analysts echoed these positive assessments in their reports.

The complaint alleges that all these statements were false. Demand was softening, the profitability of the company's core business was under severe pressure from price-cutters, the European operations were still weak, international operations continued to lose money, and the Computerland acquisition would hurt Merisel's 1994 earnings. Merisel's 1993 quarterly revenues and earnings were materially overstated, because the company was improperly recognizing revenue on shipments sent to retailers who had no obligation to pay unless they resold the merchandise, shipments sent with an unlimited right to return unsold merchandise, and shipments sent to customers who had not ordered the products. All these chickens came home to roost in the June 1994 announcement of low second-quarter price margins, and the subsequent dive in the price of Merisel stock. The stock never recovered from the decline.

According to the complaint, SEC regulations create a duty to disclose the adverse information defendants concealed. The financial statements Merisel issued for the last two quarters of 1993 and for the first quarter of 1994 were materially false and misleading and "did not fairly present Merisel's financial condition," because they improperly inflated revenues by recording sales contingent on resale, recognized unsolicited shipments as revenue, and recorded revenue for merchandise that had not been shipped. This allegedly violated SEC rulings and Generally Ac-

---

Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

cepted Accounting Principles ("GAAP") on reporting revenue.

The complaint names Deloitte as a defendant because the accounting firm examined and allegedly certified the false and misleading financial statements for 1993 and approved the statement for the first quarter of 1994. Deloitte personnel were frequently present at Merisel's corporate headquarters and had access to Merisel's internal corporate financial and business information, and therefore allegedly knew of or recklessly disregarded the company's actual business condition. The complaint states that Deloitte's certification of the financial statements was knowingly false, and Deloitte also deliberately or recklessly did not comply with Generally Accepted Auditing Standards ("GAAS"). Further, the complaint alleges that stock analysts employed by Lehman Brothers and Robinson–Humphrey, the underwriters, knowingly issued false analysts' reports.

The complaint alleges that all defendants violated Rule 10b–5 when they "directly and indirectly, engaged in and employed acts and a fraudulent scheme to conceal material adverse information" regarding Merisel. Merisel and its officers were also liable as "controlling persons" under § 20(a).

In late January 1995, Merisel and the other defendants filed a motion to dismiss or, in the alternative, for summary judgment. The motion included exhibits such as transcripts of Merisel's conference calls with stock analysts, and declarations denying that Merisel circulated analysts' reports or improperly recognized revenue. Plaintiffs filed an opposition and a motion to compel discovery. Although Robinson–Humphrey and Lehman Brothers had produced many pages of documents in response to Plaintiffs' discovery requests, Merisel had produced only one-half box of documents.

The district court granted the motion to dismiss with prejudice in April 1995

> because [the complaint] fails to meet the pleading standards enunciated in *In re GlenFed, Inc., Securities Litigation*, 42 F.3d 1541 (9th Cir.1994) (en banc). The Complaint lacks concise, intelligible allegations sufficient to put the Merisel defendants on notice of their alleged wrongdo-

ing. The Complaint also fails to plead particularized facts demonstrating that the statements made by the Merisel defendants were false when made.

The court explicitly declined to reach the summary judgment motion, designating its order as granting "the motion to dismiss only."

## ANALYSIS

### I.  *Jurisdiction*

■ The complaint names as individual defendants Theodor J. Kundtz, a securities analyst employed by Lehman Brothers, and Robert P. Anastasi, a securities analyst employed by Robinson–Humphrey. Neither of these two defendants was served, and neither appeared in court. Plaintiffs agreed with the two analysts to dismiss the claims against them without prejudice, subject to revival based on the outcome of an appeal. Merisel argues that because the analysts were not included in the district court's grant of dismissal as to "all moving defendants," the district court's dismissal was not a final judgment subject to appeal under 28 U.S.C. § 1291.

Merisel contends that an "identical conditional dismissal agreement defeated appellate jurisdiction" in *Dannenberg v. Software Toolworks, Inc.*, 16 F.3d 1073 (9th Cir.1994). In *Dannenberg*, after the district court granted summary judgment against plaintiffs on all but one cause of action against auditor defendants, the plaintiffs stipulated to dismissal of the auditor defendants, subject to refiling if any part of the partial summary judgment order were reversed on appeal. The district court approved the stipulation, but the plaintiffs neither sought nor obtained a judgment pursuant to Federal Rule of Civil Procedure 54(b), under which district courts may certify as "final" judgments as to fewer than all claims or parties. Because the stipulation did not "finalize" the district court's order, this court dismissed the appeal for lack of jurisdiction. *Id.* at 1075, 1078.

The agreement in this case is not identical to that in *Dannenberg*, however, because here the individual stock analyst defendants

with whom the plaintiffs stipulated to dismissal were never served.

If an action is dismissed as to all of the defendants who have been served and only unserved defendants remain, the district court's order may be considered final under Section 1291 for the purpose of perfecting an appeal. In such circumstances there is no reason to assume that there will be any further adjudication of the action.

*Patchick v. Kensington Publishing Corp.*, 743 F.2d 675, 677 (9th Cir.1984) (per curiam) (citations omitted). Merisel attempts to distinguish *Patchick* on the ground that its rationale derived from cases involving fictitious defendants. The unserved defendants in *Patchick*, however, were not fictitious, and no such distinction is made in other cases applying the *Patchick* rule. *See, e.g., Trulis v. Barton*, 107 F.3d 685, 691 n. 1 (9th Cir.1995) (summary judgment final as to named and served parties regardless of the fact that there were other named defendants who were not served); *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 584 n. 5 (9th Cir.1993) (citing *Patchick*, 743 F.2d at 677) ("Two unserved defendants and Doe defendants were named in the complaint. This does not affect the appealability of the district court's judgment."). *See also Gomez v. Government of Virgin Islands*, 882 F.2d 733, 736 (3d Cir.1989) (finding appellate jurisdiction when judgment did not include named, not fictitious, unserved defendants); *Sider v. Valley Line*, 857 F.2d 1043, 1045–46 (5th Cir.1988) (per curiam) (same).

We have jurisdiction.

## II. *Motion for Summary Judgment*

Merisel titled its motion as a "Motion to Dismiss Second Consolidated and Amended Complaint or, in the Alternative, For Summary Judgment," and attached an appendix of exhibits. Plaintiffs opposed the motion, and requested a continuance under Federal Rule of Civil Procedure 56(f). Plaintiffs also filed a motion to compel discovery, and a motion to strike evidence. When the district court dismissed the complaint, it also denied the motion to strike. The district court apparently declined to consider the evidence

and relied solely on the allegations in the complaint, specifying that it ruled only on the motion to dismiss.

Merisel urges us to grant its motion for summary judgment, if we reverse any part of the dismissal with prejudice. Merisel cites the transcripts, declarations, and other evidence in an effort to disprove the allegations, labelling them falsehoods and the complaint "a canard."

We decline the invitation, because discovery had not yet taken place when the case was dismissed, a Rule 56(f) motion was pending, and we cannot determine on this record whether there is a genuine issue of material fact.

## III. *Evidence Submitted by Merisel*

■ In our review of the dismissal, Merisel urges us to consider some of the documentary evidence it submitted to the district court, including transcripts of the conference calls, declarations, and a faxed copy of internal projections. Merisel contends that these documents show that the complaint's allegations that Merisel projected earnings during its conference calls with analysts and faxed internal projections to an analyst were "outright falsehoods." The evidence can be considered in reviewing the dismissal, argues Merisel, because the documents are referred to or referenced by the complaint.

■ In reviewing the district court's dismissal of the complaint we consider only the contents of the complaint, taking as true all the allegations of material fact. *Warshaw v. Xoma Corp.*, 74 F.3d 955, 957 (9th Cir.1996). In ruling on a motion to dismiss, a district court generally "may not consider any material beyond the pleadings." *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir.1994).

■ However, material which is properly submitted *as part of the complaint* may be considered on a motion to dismiss....

[A] document is not "outside" the complaint if the complaint specifically refers to the document and if its authenticity is not questioned.... [W]hen [the] plaintiff fails to introduce a pertinent document as part of his pleading, [the] defendant may intro-

duce the exhibit as part of his motion attacking the pleading.... [D]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss.

*Id.* at 453–54 (quotations & citations omitted). Thus, for example, a court ruling on a motion to dismiss may consider the full texts of documents which the complaint quotes only in part. *Fecht v. The Price Co.*, 70 F.3d 1078, 1080 n. 1 (9th Cir.1995), *cert. denied,* 517 U.S. 1136, 116 S.Ct. 1422, 134 L.Ed.2d 547 (1996); *In re Stac Electronics Sec. Litig.,* 89 F.3d 1399, 1405 n. 4 (9th Cir.1996). Merisel argues that the transcripts and other documentary evidence are "part of the complaint" and therefore can be reviewed in evaluating the district court's dismissal.

In the complaint, plaintiffs make allegations about the conference calls, but do not expressly mention or refer to the transcripts, or even identify their existence. In fact, the transcripts themselves apparently did not exist at the time plaintiffs filed their complaint; they first appeared as exhibits to Merisel's motion to dismiss, and they are accompanied by a declaration describing their transcription from tapes. Further, plaintiffs disputed the authenticity and accuracy of the transcripts in the district court, and objected to their use; they repeat those objections here. The transcripts therefore cannot be considered in ruling on the motion to dismiss.

The same holds true for the declaration submitted by Merisel to explain that the internal projections were faxed not to securities analysts but to the corporate finance department of Robinson–Humphrey. The declaration "assumes" that the projections attached to it as an exhibit are those referred to in the complaint, and then proceeds to explain that the corporate finance department did not share information with the securities analysts within Robinson–Humphrey. None of this is "referenced" in the complaint, and plaintiffs objected to these declarations in the district court and on this appeal.

Merisel cites *Townsend v. Columbia Operations,* 667 F.2d 844 (9th Cir.1982), to support its position but that case was converted by the district court from a motion to dismiss to one for summary judgment because of the need to examine certain documents. *Id.* at 848. The issue therefore was not whether the particular documents could be considered on appeal from an order of dismissal, but rather whether they were properly in the appellate record on an appeal from summary judgment.

In this appeal, we decline to consider any of the documentary evidence filed with the motion to dismiss.

### IV. *Failure to State a Claim*

The district court's order granting dismissal cites Federal Rule of Civil Procedure 12(b)(6), which authorizes dismissal of a complaint that fails to state a claim on which relief can be granted. We review de novo the dismissal of a complaint for failure to state a claim. *Warshaw,* 74 F.3d at 957. "We take as true all allegations of material fact stated in the complaint and construe them in the light most favorable to the non-moving party." *Id.* "To state a claim under § 10(b) and Rule 10b–5, the shareholders must allege that [the corporation] knowingly or recklessly published an 'untrue statement of fact' or omitted to state a material fact 'necessary to make the statements made, in light of all the circumstances in which they were made, not misleading.'" *In re Wells Fargo Sec. Litig.,* 12 F.3d 922, 926 (9th Cir. 1993) (quoting *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1113 (9th Cir.1989)).

Merisel advances several reasons why dismissal under Rule 12(b)(6) was appropriate. Since we conclude that, if proved, many of the allegations of the complaint state causes of action, we need not at this juncture in the case opine on some of the closer questions, such as whether the rosy forecasts were known to be false and are therefore actionable. These judgments should be made after discovery is complete.

### A. *Merisel's Liability for Statements of Securities Analysts*

Merisel argues that it is not responsible for the recommendations of securities

analysts, even if it provided information on which the analysts' assessments were based. This argument fails, as we have held that corporate defendants may be directly liable under 10b–5 for providing false or misleading information to third-party securities analysts.

> [I]f defendants intentionally misled securities analysts and the press in order to stave off a Xoma stock sell off, then these third-party reports would be relevant to determine Xoma's securities fraud liability. The Complaint asserts that Xoma intentionally used these third parties to disseminate false information to the investing public. If this is true, Xoma cannot escape liability simply because it carried out its alleged fraud through the public statements of third parties. The Complaint should not have been dismissed under 12(b)(6) without a contextual, "delicate assessment" of the facts presented-including the statements of third-party analysts.

*Warshaw,* 74 F.3d at 959 (citation omitted). Merisel contends that our decisions in *In re Stac Electronics Securities Litigation,* 89 F.3d 1399 (9th Cir.1996) ("*Stac*") and *In re Syntex Corporation Securities Litigation,* 95 F.3d 922 (9th Cir.1996) ("*Syntex*") foreclose liability for corporate defendants who provide information to securities analysts without placing "their imprimatur, express or implied, on the projections" issued by analysts. *Syntex,* 95 F.3d at 934 (quoting *Stac,* 89 F.3d at 1410). However, our decisions in *Stac* and *Syntex* did not consider whether corporate defendants could be directly liable for misrepresentations to securities analysts. *See In re Cirrus Logic Securities Litigation,* 946 F.Supp. 1446, 1467 n. 13 (N.D.Cal.1996). Instead, the issue in *Stac* and *Syntex* was whether corporate defendants could be held liable for analysts' interpretations of defendants' truthful statements. *See id.* Our decisions in *Stac* and *Syntex* do not preclude plaintiffs' claims that Merisel made false and misleading statements to securities analysts with the intent that the analysts communicate those statements to the market.

### B. *Central Bank*

In *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court held that there could be no liability under § 10(b) for aiding and abetting securities fraud. Unless the defendant "commit[ted] a manipulative or deceptive act within the meaning of § 10(b)," the defendant has not violated the securities laws. *Id.* at 191, 114 S.Ct. at 1455.

Merisel claims that *Central Bank* precludes holding it liable for the analysts' statements. As *Warshaw* held, this argument is foreclosed. Merisel is alleged to have made misleading statements to the analysts with the intent that the analysts communicate those statements to the market. This is not aiding and abetting or secondary liability; the complaint alleges that Merisel is liable for its own false statements to the analysts. *See In re Software Toolworks Inc. Sec. Litig.,* 50 F.3d 615, 628 n. 3 (9th Cir.1995) (complaint's allegation of accountant's liability for company's letter to SEC actionable under *Central Bank* because allegations that accountant participated in drafting letter enough for primary cause of action).

Merisel also argues that plaintiffs cannot allege a "scheme" to defraud, because those are conspiracy allegations foreclosed by *Central Bank.* After *Central Bank,* there is no private right of action for "conspiracy" liability under the securities laws. *In re GlenFed, Inc. Sec. Litig.,* 60 F.3d 591, 592 (9th Cir. 1995) ("*GlenFed II*"). The complaint does not allege a conspiracy, however, as a separate cause of action. Instead, it alleges a "scheme" in which Merisel and the other defendants directly participated, tracking the language of Rule 10b–5(a), which makes it unlawful for any person "[t]o employ any device, *scheme,* or artifice to defraud." (emphasis added).

█ *Central Bank* does not preclude liability based on allegations that a group of defendants acted together to violate the securities laws, as long as each defendant committed a manipulative or deceptive act in furtherance of the scheme.

> The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a

lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming *all* of the requirements for primary liability under Rule 10b–5 are met. In any complex securities fraud, moreover, there are likely to be multiple violators; in this case, for example, respondents named four defendants as primary violators.

*Central Bank,* 511 U.S. at 191, 114 S.Ct. at 1455 (citation omitted).

Plaintiffs' claims therefore are not barred by *Central Bank* in that they are asserting that Merisel, through false statements to analysts, and those analysts, by issuing reports based on statements they knew were false, together engaged in a scheme to defraud the shareholders.

## V. *Necessity of Particularity*

The district court found that the complaint did not satisfy Federal Rule of Civil Procedure 9(b). It stated only that the complaint "fails to plead particularized facts demonstrating that the statements made by the Merisel defendants were false when made." The order cites *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541 (9th Cir.1994) (en banc) ("*GlenFed I*"), which relied on Rule 9(b), and at the hearing on the motion the district court stated: "The motion to dismiss is granted with prejudice, and see what the court of appeals has to say about *GlenFed.*"

Federal Rule of Civil Procedure 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." The rule applies to actions brought under the federal securities laws. *GlenFed I,* 42 F.3d at 1545. To satisfy Rule 9(b),

> a plaintiff must set forth *more* than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false. In other words, the plaintiff must set forth an explanation

as to why the statement or omission complained of was false or misleading.

*GlenFed I,* 42 F.3d at 1548.

### A. *Falsity of Statements*

█ *GlenFed I* sets out a useful hypothetical for determining whether the complaint alleged a false statement that was both false when uttered and false when the plaintiff-shareholders discovered the truth:

> [A] plaintiff might allege that he bought a house from defendant, that defendant assured him that it was in perfect shape, and that in fact the house turned out to be built on landfill, or in a highly irradiated area; plaintiff could simply set forth these facts (presumably along with time and place), allege scienter in conclusory fashion, and be in compliance with Rule 9(b). We agree that such a pleading would satisfy the rule. Since "in perfect shape" and "built on landfill" are at least arguably inconsistent, plaintiff would have set forth the most central "circumstance constituting fraud"—namely, that what defendant said was false. Notably, the statement would have been just as false when defendant uttered it as when plaintiff discovered the truth.

*Id.* Here, the shareholders argue that they have satisfied this test. The complaint alleges that they purchased Merisel's stock, and that Merisel assured them (through its financial statements, its own positive statements, and optimistic projections mirrored in analysts' reports) that Merisel was in good shape due to its acquisition of Computerland, its reorganization overseas, and its positive sales figures. In fact, the Computerland acquisition had plunged Merisel deep into debt, its overseas operations continued to lose money, and it was improperly recognizing revenue from shipments of unordered goods and goods shipped on consignment to keep up the appearance of high sales; as a result, its second quarter earnings for 1994 were disastrously low. Merisel's stock plummeted in value. Merisel's assurances took place at specified times during the class period, and the defendants knew they were false. Merisel's financial house, in other words, was built on a landfill. Because "falseness is clear from the facts that had existed all along and

were later revealed," *id.* at 1549, the complaint meets *GlenFed I*'s requirements on this "skeletal analysis," *Warshaw,* 74 F.3d at 960 (setting forth a similar brief analysis).

In *Fecht,* we applied the rule that a complaint must contain allegations that fraudulent statements were false when made, and found the complaint satisfied Rule 9(b). 70 F.3d at 1083–84. Applying *Fecht*'s analysis here, the complaint alleges that the positive statements about the Computerland acquisition were false when made, because in truth the purchase created a debt that Merisel could not support. To ensure that a stock offering would ease its debt burden, Merisel misrepresented the state of its overseas operations and its overall prospects to stock analysts, who passed that misinformation on to the market. To keep its annual and quarterly reports positive, Merisel engaged, with Deloitte's help, in deceptive accounting practices. "For purposes of Rule 9(b), allegations of specific problems undermining a defendant's optimistic claims suffice to explain *how* the claims are false." *Id.* at 1083.

In addition, the complaint alleges that Merisel decided to cancel the stock offering very shortly after optimistic statements were made (three weeks before June 7). "This shortness of time is circumstantial evidence that the optimistic statements were false when made." *Id.* The circumstantial evidence mounts with the allegations that the need for the proceeds from a stock offering was great, and that company officials sold their stock at inflated prices while Merisel expressed optimism for the future. *See id.* at 1084.

We hold that the complaint adequately alleged the falsity of the statements.

### B. *Revenue Recognition*

■ Merisel argues strongly that the claims of improper revenue recognition are too vague to satisfy Rule 9(b).

The complaint alleges that in order to falsify its 1993 third and fourth quarter revenues, Merisel

> deliberately shipped excessive amounts of product to several of its accounts....

In many instances, Merisel promised the customer that they would not have to pay for the product unless and until they resold it. In other instances, Merisel actually shipped merchandise that had not been ordered by the customer. These customers included: Comp. USA, CompuCom, Corporate Software, SoftMart, Egghead Software, P.C. Connection, Microcenter, Software, Etc.

The complaint further alleges that GAAP required Merisel to defer revenue recognition on these shipments until payment was received, and that Merisel failed to do so, instead reporting them immediately in order to overstate its revenues. The complaint lists the dollar amounts of overstatements of revenues, net income, and earnings per share for the third and fourth quarters of 1993. As a result of these overshipments, an unprecedented number of returns in the first quarter of 1994 resulted in a declining profit margin; Merisel concealed the high return rate and claimed the profit margin problem was due to price-cutting. Merisel continued this strategy in the first quarter and as a result overstated revenue for the first quarter, also listed as a dollar amount.

■ A "company that 'substantially overstate[s] its revenues by reporting consignment transactions as sales ... mak[es] false or misleading statements of material fact.'" *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1418 (9th Cir.1994) (quoting *Malone v. Microdyne Corp.,* 26 F.3d 471, 478 (4th Cir. 1994)). Nevertheless, Merisel claims the allegations of overstatement are not specific enough, because "the Complaint does not allege the time, customer, amount, or other circumstances, of a single wrongful transaction of any type." Merisel cites *DiLeo v. Ernst & Young,* 901 F.2d 624 (7th Cir.1990), for the proposition that the failure to plead a specific transaction is fatal.

In *DiLeo,* the class plaintiff alleged that a bank burdened with a large number of bad loans did not increase its reserves fast enough. The central allegation was that the defendants, the bank's accountants, knew of this problem before the class members bought the bank's stock. *Id.* at 626. The complaint did not, however, give any exam-

ples of problem loans, or provide any concrete examples, other than stating that additional reserves "of at least $600 million" were necessary, and that credit losses were understated by "approximately 4 billion," while nonperforming loans were "materially understated." *Id.* at 626–27. Holding that "even a large column of big numbers need not add up to fraud," the Seventh Circuit affirmed the dismissal of the complaint. *Id.* at 627. The plaintiffs had not pled the "who, what, when, where, and how" that would suggest fraud, rather than a business mistake viewed with the benefit of hindsight. *Id.* at 627–28.

In this case, the complaint identified who (eight of Merisel's customers), what (four types of improper revenue recognition), when (last two quarters of 1993 and first quarter of 1994), and where (reported in financial statements). The complaint alleged that Merisel misled by inflating its revenues by specific amounts, and by falsely claiming that its revenue recognition policy was stricter than it really was ("how"). This is more than fraud by hindsight, and far more specific than *DiLeo*'s allegations, which did not specify which customer's loans were problems, what was problematic about them, or how the defendant intentionally misled the stockholders.

It is not fatal to the complaint that it does not describe in detail a single specific transaction (i.e. shipment) in which Merisel transgressed as above, by customer, amount, and precise method. Comparable precedent does not require greater detail. In *Fecht,* we found sufficiently particular allegations that newly opened Price Co. stores had low sales volumes, and that nine named stores (three in particular) were losing money. 70 F.3d at 1083 n. 5 & n. 6. We did not require a specific number or a precise time frame. The complaints in *GlenFed I* and *Wells Fargo* each alleged "specific problems which they allege undermined defendants' optimistic claims," rather than "stat[ing] simply that defendants' public statements were false, without explaining *how* they were false." *GlenFed I,* 42 F.3d at 1551; *Wells Fargo,* 12 F.3d at 926–28. Both cases pointed to specific problem loans. *Id.* Here, the complaint points to specific quarters and specific cus-

tomers, and provides dollar figures for each quarter.

We hold that the complaint meets the particularity requirement of Rule 9(b). Overall, the complaint "'identifies the circumstances of the alleged fraud so that defendants can prepare an adequate answer.'" *Warshaw,* 74 F.3d at 960 (quoting *Kaplan v. Rose,* 49 F.3d 1363, 1370 (9th Cir.1994), *cert. denied,* 516 U.S. 810, 116 S.Ct. 58, 133 L.Ed.2d 21 (1995)). We decline to require that a complaint must allege specific shipments to specific customers at specific times with a specific dollar amount of improperly recognized revenue; "we cannot make Rule 9(b) carry more weight than it was meant to bear." *GlenFed I,* 42 F.3d at 1554. If the shareholders cannot prove any specific instances of excessive revenue recognition with specific customers, they will not prevail on that claim at summary judgment or trial. Because "[w]e do not test the evidence at this stage," *id.* at 1550, the complaint should go forward.

## VI. *Other Defendants*

### A. *Lehman Brothers and Robinson–Humphrey*

■ Both underwriter defendants argue that the complaint's allegations are not specific enough under Rule 9(b) because they fail to describe why the stock analysts' statements were false when made. We already have held that the allegations of false statements were sufficiently specific in identifying the conditions at Merisel which made Merisel's optimistic assessments and financial statements false or misleading; the same specifically alleged conditions make the analysts' statements pass muster under Rule 9(b).

### B. *Scienter*

■ The underwriters' real claim, however, is that the complaint was not specific enough in identifying how the analysts they employ *knew* of the conditions at Merisel that made their statements false or misleading. The complaint alleges that

[b]ecause of their ... positions as securities analysts employed by Merisel's invest-

ment banker, ... each of the defendants (a) knew or had access to the material, adverse non-public information about Merisel's adverse financial outlook and then existing business conditions which was not disclosed; and (b) drafted, reviewed and/or approved the misleading statements, releases, reports and other public representations of and about Merisel.

Quoting *Neubronner v. Milken*, 6 F.3d 666 (9th Cir.1993), the underwriters insist that the shareholder plaintiffs must plead "specifically what information [the analysts] obtained, when and from whom [they] obtained it, and how [they] used it for [their] own advantage." *Id.* at 672. They argue that the complaint must allege in detail the basis of Robinson–Humphrey's and Lehman Brothers' *knowledge* that the statements their analysts made were fraudulent; how that information filtered from the corporate finance department into the analysts' department; and what specific information the analysts falsified in preparing their reports.

This amounts to an argument that scienter, not falsity, must be pled with specificity. *GlenFed I* is to the contrary.

[W]hen a complaint alleges with particularity the circumstances constituting fraud, as required by [Rule 9(b) ], then generally it will also have set forth facts from which an inference of scienter could be drawn.... If, however, [defendants' argument] is read ... to mean that Rule 9(b) contains an *independent* requirement that the complaint allege with particularity facts giving rise to an inference of scienter—which we would take to mean alleging such things as that defendants had read or otherwise knew about particular documents giving rise to an inference that the charged statements were false when made—then we decline to adopt it.

42 F.3d at 1546. To hold that the shareholders' complaint must explain what specific information the analysts obtained to make them know that their statements were false would ignore Rule 9(b)'s simple statement that "knowledge ... may be averred generally." [2]

*Neubronner* does not require more. As we noted in *GlenFed I*, the allegations of Rule 10b–5 violations in *Neubronner* were dismissed not because knowledge was not specifically alleged but because the complaint attributed no false statements to the defendant. *GlenFed I*, 42 F.3d at 1546 n. 6 (citing *Neubronner*, 6 F.3d at 673). The language that the underwriters quote is from the court's discussion of insider trading, not false statements. The complaint did not plead any trading at all, nor did it specify what nonpublic information the defendant had to give him an inside edge; it therefore "offers no specific facts demonstrating wrongdoing which [the defendant] could deny or otherwise controvert." *Neubronner*, 6 F.3d at 672.

Here, unlike in *Neubronner*, the plaintiffs allege with sufficient specificity false statements by Robinson–Humphrey and Lehman Brothers employees, specify the conditions at Merisel which gave the lie to the analysts' statements, and specify that the investment banks' close relationship with Merisel gave them access to inside information.[3] That gives rise to the inference that the analysts knew their reports were false.

Robinson–Humphrey and Lehman Brothers assert that they followed SEC rules which prevent the sharing of inside information within their companies. 15 U.S.C. § 78o(f) requires registered brokers or dealers to create and enforce "written policies and procedures reasonably designed ... to prevent the misuse ... of material, nonpublic information by such broker or dealer or any person associated with such broker or dealer," and authorizes the SEC to create rules

---

**2.** 15 U.S.C. § 78u–4(b)(2) now requires that in securities fraud actions "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." This section does not apply to any action commenced before and pending on December 22, 1995.

**3.** If later proceedings demonstrate that plaintiffs' counsel possessed no evidence supporting these allegations at the time the complaint was filed, the district court may consider sanctions under Rule 11. *See California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1472 (9th Cir.1987).

for such policies. If Robinson–Humphrey and Lehman Brothers have established such policies and followed them in this case, they may raise that as a defense. The existence of such policies does not, however, preclude plaintiffs from asserting in their complaint that inside information was misused.

### C. Optimistic Statements

■ The underwriters also contend that some of the alleged false statements are merely optimistic projections, and therefore not misleading. Robinson–Humphrey, however, made specific forecasts of earnings increases due to the Computerland acquisition, and after the 1994 first-quarter decline in price margins, wrote that Merisel was raising prices in response. The complaint alleges that Merisel was actually continuing to cut prices.

Lehman Brothers also made specific forecasts. After the first-quarter decline Lehman also stated that Merisel had begun to raise prices. These statements are not mere optimism. Nor were they all forecasts; both Lehman Brothers and Robinson–Humphrey made statements about current conditions and trends at Merisel. Although the complaint quotes other analysts who made similar positive statements about Merisel's current status and future prospects, this does not mean that the Lehman Brothers and Robinson–Humphrey analysts' statements are somehow automatically reasonable. All the analysts wrote optimistic reports based in part on information from Merisel; only Robinson–Humphrey and Lehman Brothers are alleged to have known better through their access to inside information.

■ Even the analysts' optimistic statements can be actionable if not genuinely and reasonably believed, or if the speaker is aware of undisclosed facts that tend seriously to undermine the statement's accuracy. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir.1989). The complaint alleges that the analysts were aware of undisclosed facts that showed there was no reasonable basis for their forecasts, which they did not genuinely believe.

The allegations against the underwriter defendants also survive the motion to dismiss.

### D. Deloitte

■ Deloitte, Merisel's accountant in 1992 and 1993, argues that the allegation that it knowingly certified false and misleading financial statements fails to allege any connection between Merisel's allegedly improper accounting practices and any customers, claiming "the mere recitation of the names of some of Merisel's many customers adds nothing to appellants' allegations of fraud."

The complaint does more than merely recite customer names. It alleges that Merisel engaged in a variety of improper accounting practices in shipments to customers, and then alleges that "[t]hese customers included: Comp. USA, CompuCom, Corporate Software, Softmart, Egghead Software, P.C. Connection, MicroCenter, Software, Etc." If, as Deloitte implies, this is just a random list of some of Merisel's larger customers, that is a factual issue that cannot be resolved on a motion to dismiss. Accepting the allegations as true, it appears that each of the named customers received shipments on which Merisel improperly recognized revenue in the second half of 1993 and first quarter of 1994, and Deloitte knowingly certified financial statements including the false revenue figures.

Deloitte also protests that the complaint does not allege specific instances of sales to customers in which revenue was recognized improperly. As we noted above, that level of specificity is not required. Finally, Deloitte points out that Merisel disclosed its revenue recognition policy, as quoted in the complaint. The complaint goes on to allege, however, that the company's actions were contrary to its stated policy.

We hold that the allegations against Deloitte should not have been dismissed.

### CONCLUSION

We reverse the district court's dismissal of the complaint, and remand for further proceedings.