Ernie **BURNETT, et al., Plaintiff(s),**

v.

Jeanne Marie **ROWZEE,
et al., Defendant(s).**

**Nos. SACV 07–0393 DOC (ANx),
SACV 07–0641 DOC (ANx).**

United States District Court,
C.D. California.

Feb. 11, 2008.

Steven L. Krongold, Krongold Law Firm PC, Irvine, CA, for Plaintiffs.

David L. Casterline, David L. Casterline Law Offices, Hermosa Beach, CA, John H. Carney, John H. Carney & Associates, Dallas, TX, Scott M. Schlegel, Law Offices of Scott M. Schlegel, San Diego, CA, for Defendants.

Brooke Robbins Harvey, Prosper, TX, pro se.

## *ORDER* DENYING DEFENDANTS' MOTION TO DISMISS

DAVID O. CARTER, District Judge.

Before the Court is Defendants James Halstead, GamePlanJH, LLC and Game-Plan, Inc.'s (collectively "Defendants") Motion to Dismiss Plaintiffs' Second Amended Complaint (the "Motion"). After considering the moving, opposing and replying papers, and for the foregoing reasons, the Court hereby DENIES Defendants' Motion.

## I. BACKGROUND

The present Motion comes before the Court in one of four related cases: *Mack–University, LLC v. Halstead,* 07–0393; *Pierce v. Rowzee,* 07–0591; *Burnett v. Rowzee,* 07–641; and *Dusky v. Bellasaire Investments,* 07–0874. These cases were recently consolidated with *Mack–University, LLC v. Halstead* designated as the lead

case. *See* Minute Order, November 26, 2007.

Each of the four cases arises out of the alleged "PIPES Ponzi Scheme." Second Amended Compl., ¶¶ 5–7 ("SAC"). Pursuant to this scheme, Jeanne Rowzee ("Rowzee"), a licensed securities attorney, promised to use her ties to investment bankers to piggy-back on highly-profitable investments. *Id.* ¶ 32. Specifically, Rowzee promised to invest funds in short term "bridge loans" to companies in the process of obtaining PIPES financing. *Id.* No such investments were ever made. *Id.* ¶ 8. Instead, in classic Ponzi style, the principals of the PIPES Scheme solicited additional investments and used those investments to pay returns to earlier investors. *Id.* Rather than invest the funds, the Defendants purportedly diverted them to their own ends, disguising these payments as "commissions." *Id.* ¶ 9, 37. The millions of dollars of diverted funds provided the scheme's principals with a lavish lifestyle of extravagant parties, high-class escorts, exotic cars, and the like. *Id.* ¶ 10.

Defendant James Halstead ("Halstead") was allegedly the "pitch man" in this scheme. Plaintiffs' Opp'n to Defendants' Motion to Dismiss ("Opp'n") 4:15–16. In 2004, Halstead, "using the services" of Defendant Robert Harvey ("Harvey"), raised $950,000 in investments for GamePlanJH, LLC and GamePlan, Inc. ("GamePlan"), which he owned and controlled. SAC. ¶ 35. He paid these investors substantial returns on their initial investments from funds derived from subsequent investment. *Id.* ¶¶ 35, 37.

On May 2, 2005, Harvey organized Harvest Income, a California limited liability company. *Id.* ¶ 41. Harvey then solicited investment in Harvest Income through a power-point presentation and an operating agreement. *Id.* ¶¶ 42–43. In doing so, allegedly with the help of Rowzee and

Halstead, Harvey made various misrepresentations concerning PIPES investments. *Id.* ¶¶ 45–47. Plaintiffs invested $7.1 million dollars into the scheme by "rolling over" their GamePlan investments and/or making new investments. *Id.* ¶ 48.

Halstead and Harvey transferred all of the funds they raised to Rowzee's bank accounts. *Id.* ¶ 33. She then sent distributions and payouts from these accounts. *Id.* ¶¶ 33, 49. Some of these transfers were made directly to the principals of the scheme. *Id.*

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted. Once it has adequately stated a claim, a plaintiff may support the allegations in its complaint with any set of facts consistent with those allegations. *Bell Atlantic Corp. v. Twombly,* —— U.S. ——, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007); *see Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1990) (stating that a complaint should be dismissed only when it lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory). Dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its claim that would entitle it to relief. *Bell Atlantic,* 127 S.Ct. at 1968 (abrogating *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

The Court must accept as true all factual allegations in the complaint and must draw all reasonable inferences from those allegations, construing the complaint in the light most favorable to the plaintiff. *Guerrero v. Gates,* 442 F.3d 697, 703 (9th Cir.2006); *Balistreri,* 901 F.2d at 699. Dismissal without leave to amend is appropriate only when the Court is satisfied that the deficiencies in the complaint could not possibly be cured by amendment. *Jackson v. Carey,* 353 F.3d 750, 758 (9th Cir. 2003) (citing *Chang v. Chen,* 80 F.3d 1293, 1296 (9th Cir.1996)); *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir.2000).

■ Additionally, fraud claims must be pled with more particularity than other claims. Federal Rule of Civil Procedure 9(b) provides that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). "Rule 9(b) ensures that allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir.1985). Rule 9(b) therefore requires that allegations of fraud identify the parties to the misrepresentation such that each defendant is on notice of what specifically they are accused of. *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.,* 940 F.2d 397, 405 (9th Cir.1991).

■ Through the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Congress has imposed heightened pleading standards on securities fraud actions. 15 U.S.C. §§ 78u–4(b)(1), (2). "The purpose of this heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading 'fraud by hindsight.'" *In re Vantive Corp. Sec. Lit.,* 283 F.3d 1079, 1084–85 (9th Cir.2002) (citing *In re Silicon Graphics Sec. Litig.,* 183 F.3d 970, 973 (9th Cir.1999)). In this case, PSLRA requires that the complaint, "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Id.* (citing 15 U.S.C. §§ 78u–4(b)(2)) (emphasis added). The Plaintiff "must plead, in

great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Silicon Graphics*, 183 F.3d at 974.

■ A showing of "recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct." *Id.* at 977. It must be an "extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it." *Id.* at 984. A plaintiff cannot proceed on allegations of mere "motive and opportunity" but instead must "state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Id.* at 979.

■ In considering circumstantial evidence of scienter, the Court must adopt a "holistic" approach, considering the evidence in its entirety and each competing inference reasonably drawn therefrom. *See Tellabs v. Makor Issues & Rights Ltd.*, — U.S. —, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007); *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir.2002). The "inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences'...." *Tellabs*, 127 S.Ct. at 2510. However, it "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.*

## III. DISCUSSION

■ Plaintiffs claim that Halstead and GamePlan violated § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j, and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5. To state a claim under § 10(b) and Rule 10b–5, Plaintiff's must allege: 1) a manipulative or deceptive device; 2) scienter; 3)

a connection with the purchase or sale of a security; 4) reliance; 5) economic loss; and 6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). The "manipulative or deceptive device" requirement may be satisfied by any of the following: a "device, scheme, or artifice to defraud;" a material misstatement or omission; or an "act, practice or course of business which operates or would operate as a fraud." *See* 17 C.F.R. § 240.10b–5.

### A. Deceptive Act

■ Plaintiff effectively conceded that it is not pursuing a misrepresentation or omission theory against Halstead. *See* Opp'n 1:13–27; *see also* October 18, 2007 Minute Order 5–6. Plaintiffs rely instead on "scheme liability"—i.e. Halstead's deceptive acts in implementing the PIPES Scheme. *See Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, — U.S. —, 128 S.Ct. 761, 770, 169 L.Ed.2d 627 (2008). Under this theory, relevant deceptive acts "include[ ] deception as part of a larger scheme to defraud the securities market." *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1047 (9th Cir.2006); *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir.1997). Such an act is one that has, "the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *Simpson*, 452 F.3d at 1048 (certiorari granted and judgment vacated for reconsideration in *Avis Budget Group, Inc. v. California State Teachers' Retirement System*, — U.S. —, 128 S.Ct. 1119, 169 L.Ed.2d 945 (2008)).

■ There is no private "aiding and abetting" or "conspiracy" liability under § 10(b) of the Securities and Exchange Act, or Rule 10b–5 promulgated thereunder. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.* ("*Central Bank*"), 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994); *In re*

*GlenFed, Inc. Sec. Litig. ("GlenFed II"),* 60 F.3d 591, 592 (9th Cir.1995). Accordingly, Halstead may only be liable as a primary actor; that is, he must have committed a deceptive act in furtherance of the scheme upon which Plaintiff relied. *See Stoneridge,* 128 S.Ct. at 770–72. As the Supreme Court warned in *Stoneridge,* this Court must take care to avoid resurrecting aiding and abetting liability under the guise of primary liability for a fraudulent scheme. 128 S.Ct. at 771 (avoiding an interpretation of § 10(b) that "would revive in substance the [private] cause of action against all aiders and abettors except those who committed no deceptive act in the process of facilitating the fraud"). Mere allegations that a defendant committed a deceptive act, even one in furtherance of a scheme to defraud investors, are insufficient. *Id.* at 771. Instead, this Court is compelled to focus on the elements of reliance and causation in order to determine whether Halstead's deceptive acts, if any, were the proximate cause of Plaintiffs' injury. *Id.*

Because fraud under § 10(b) and Rule 10b–5 must arise "in connection with the purchase or sale of securities," *see Dura Pharms., supra,* it is imperative that the Court limit its consideration to allegations relevant to the purchase or sale of securities. This Court previously held that "membership interests in Harvest Income" were relevant securities. *See* Opp'n at 8:25–26. Plaintiff does not argue that the fraud concerned any other securities. Accordingly, the Court limits its consideration to allegations concerning the purchase or sale of Harvest Income membership interests.

To satisfy the deceptive act requirement, Plaintiffs rely, in part, on Halstead's general participation in the PIPES Scheme—e.g. Halstead's admission that he was one of the "earliest participants" or investors, Halstead's raising more than $20 million in fraudulent PIPES investments, the history of transfers between Halstead and Rowzee. Opp'n 4:15–28. Additionally, Plaintiffs point to Halstead's efforts to "conceal[ ] his knowledge that no investments were being made ...," including his efforts to erase data on his laptop computer. *Id.* 5:23–6:2.

■ These allegations are deficient in that they fail to comport with the heightened pleading requirements for fraud under Rule 9(b). Indeed, most of these contentions in Plaintiffs' Opposition fail to correspond to any portion of the SAC itself, and the referenced sections fail to provide any specifics concerning the allegedly deceptive acts. *See Bly–Magee v. California,* 236 F.3d 1014, 1019 (9th Cir. 2001) ("To comply with Rule 9(b), allegations of fraud must be 'specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.'") (citing *Neubronner v. Milken,* 6 F.3d 666, 672 (9th Cir.1993)) Instead, Plaintiff's allegations consist of conclusory statements concerning the general nature of the scheme.

Additionally, and more fundamentally, these allegations fail to satisfy the requirements for primary liability set out in *Stoneridge.* Many of the acts, for instance funds transfers to Rowzee, are not in themselves deceptive. The balance, such as Halstead removing data from his laptop, even if deceptive, were not relied on by Plaintiffs.[1] Indeed, these are much like

---

1. As to the generalized allegations that Halstead "concealed" information, Defendants are correct in suggesting that Plaintiffs have failed to allege any facts suggesting that Halstead was bound to disclose any information to the Plaintiffs concerning their purchase of the Harvest securities at issue. Defendants' Reply 5:7–9 ("Reply").

the allegations found insufficient in *Stoneridge* in that they concern the functioning of the PIPES scheme rather than the sale of securities pursuant to that scheme. *Stoneridge, supra.*

■ Plaintiffs also assert that Halstead can be liable for Harvey's conduct under the doctrines of *respondeat superior* or estoppel due to Harvey's express or ostensible agency. Under a *respondeat superior* theory, a principal may be responsible for the acts of an agent or employee in the scope of that agency or employment. *New York Cent. & H.R.R. Co. v. United States,* 212 U.S. 481, 493, 29 S.Ct. 304, 53 L.Ed. 613 (1909); *Garton v. Title Ins. & Trust Co.,* 106 Cal.App.3d 365, 375–76, 165 Cal. Rptr. 449 (1980) ("the doctrine of *respondeat superior* imposes liability upon an innocent principal or employer for the torts of his agent or employee which are committed within the scope of employment. . . .") Ostensible agency exists where "the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." Cal. Civ.Code § 2300.

With respect to Harvey's agency, the SAC merely alleges in conclusory fashion that "Halstead raised at least *$950,000* from Plaintiffs using the services of Harvey." SAC ¶ 35 (emphasis in original). It fails to allege, even as a bald conclusion, that Harvey was Halstead's agent, that Halstead "employed" Harvey, or that Halstead caused anyone to believe that Harvey was his agent. However, the question of whether these sparse allegations are sufficient to establish agency for purposes of a motion to dismiss is moot. There is no allegation anywhere in the complaint that this initial $950,000 investment in GamePlan was connected with the purchase

or sale of the relevant securities. Instead, Plaintiffs merely claim that a portion of these funds were "rolled-over" into Harvest Income membership interests in later transactions.

The only allegation concerning an agency relationship—ostensible or otherwise—between Harvey and Halstead with respect to Harvest Income is the assertion that Harvey "made misrepresentations with the knowledge and assistance of Halstead and Rowzee." SAC ¶ 45. The theory that Halstead could be liable for "knowledge and assistance" in Harvy's misconduct is foreclosed by *Central Bank* limitation on aiding and abetting liability.

Indeed, Plaintiff can only point to one set of allegations that possibly satisfy the reliance requirement of *Stoneridge*: that Halstead engaged in "sham transactions" by which he made interest payments to "Early Investors" in GamePlan. SAC ¶¶ 37–40.[2] According to Plaintiffs, investors relied on the "false appearance" created by these interest payments to make investments and encourage others to invest in the scheme. *Id.* ¶ 39.

■ The allegations concerning the "sham" interest payments are made with sufficient specificity. The SAC lists payments made by GamePlan to each of the "Early Investors" and the date of such payments. SAC ¶ 37. Additionally, in light of the general allegations concerning the PIPES Scheme, it appears that the "principal purpose and effect" of such payments was to create a false appearance of fact. Indeed, payment of exceptional returns on initial investments is the defining feature of a Ponzi scheme. It allows the schemes principals to continue to draw investment from other sources by creating

---

**2.** The "Early Investors" were Plaintiffs Bradley, Burnett, Campos, Curtis, Gluzman, Mars- den and Sheets. SAC ¶ 38.

the appearance of a viable investment opportunity. If the allegations in the SAC are to be believed, there was no other reason for Halstead to pay initial investors high rates of return except to keep up the ruse that Rowzee was making successful PIPES investments on the investors' behalf.

Further, Plaintiff is correct in contending that the interest payments here are distinct from the sham transactions entered in *Stoneridge*. In *Stoneridge*, potential investors had no contact with the companies engaged in the alleged sham transactions or any apparent awareness of such transactions. 127 S.Ct. at 767. Instead, they relied on financial statements that were based, in part, on such transactions. *Id.* Therefore, the Court found an insufficient causal connection between the transactions and the purchase of securities. *Id.* at 770.

If the SAC is to be believed, contrary to Defendants' contention, the relationship between the sham transactions and the purchase of Harvest Income securities was sufficiently direct and immediate to find that Halstead was a primary violator. The same individuals who invested in Game-Plan and received extraordinary returns "rolled-over" these investments into Harvest Income securities. In doing so, they relied, at least in part, on the previous interest payments. Additionally, these early investors purportedly solicited others in reliance on the interest payments. These investors also purchased securities in reasonably foreseeable reliance on the interest paid to earlier investors. This is, after all, the *modus operandi* of a Ponzi scheme.

This is not a case where transactions between GamePlan and Harvest Income were recorded in Harvest Income's records and then incorporated into financial statements eventually relied on by Plaintiffs. Instead, purchasers of Harvest Income securities had direct contact with GamePlan and, relying on information gained from this relationship, invested in Harvest Income. To be clear, under the allegations of the SAC, Halstead cannot be liable for purchases based only on the Harvest Income operating agreement or power-point presentations. His conduct, as alleged, was too remote from such documents. However, he can liable for those investments that took place in reliance on sham transactions that he conducted with individual investors.[3]

Therefore, Plaintiff has alleged at least one deceptive act upon which investors relied in connection with their purchase of Harvest Income membership interests.

### B. Economic Loss and Loss Causation

PSLRA sets out the "loss causation" requirement for private securities actions: the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate [Rule 10(b) ] caused the loss for which the plaintiff seeks to recover. 15 U.S.C. § 78u–4(b)(4). In other words, the plaintiff must plead and prove that "[its] injury . . . is directly attributable both to the wrongful conduct and to the form and manner in which the challenged transaction occurred." 3 THOMAS LEE HAZEN, LAW SEC. REG § 12.11[3] (5th ed.); *see also Dura Pharms.*, 544 U.S. at 346, 125 S.Ct. 1627 (to survive motion to dismiss plaintiff must plead loss causation).

Defendant relies on *Dura Pharmaceuticals* to show that Plaintiff has inadequately alleged loss causation. Mot. 13:22–14:9.

---

**3.** Defendants' insistence that Plaintiffs' allegations concerning the interest payments "are based upon a non-existent duty of Halstead to disclose," is misplaced. Plaintiffs' allegations are not that Halstead omitted material facts, but that his act of distributing the interest payments was deceptive.

In that case, the Supreme Court rejected the Ninth Circuits holding which allowed a plaintiff to satisfy the loss causation element by showing, merely, that the price of the security in question was inflated by defendants' misrepresentations. *Dura Pharms.*, 544 U.S. at 346, 125 S.Ct. 1627. Instead the Supreme Court required an actual showing that the Defendants' misrepresentations caused the harm suffered by Plaintiffs, in that case a decline in share price. *Id.* Defendants contend that because Plaintiffs have failed to show a "nexus" between Halstead's conduct and Harvest Income's purchase of fraudulent loans from Rowzee, that they cannot establish loss causation. Mot. 14:10–16.

This argument misses the point. As Plaintiffs note, the allegations in the SAC suggest that Halstead's deceptive acts in making interest payments induced Plaintiffs to purchase securities, the proceeds of which were diverted to Halstead, Harvey, and Rowzee, among others. Opp'n 9:6–7. Clearly Halstead's allegedly deceptive acts lack any "nexus" to the purchase of bridge loans. But Defendants take too narrow a view of the complaint. The harm alleged by Plaintiffs is not for losses through purchase of non-existent bridge loans, it is the diversion of Plaintiffs' investment through a fraudulent scheme. Among such investments were Plaintiffs purchases of Harvest Income securities.

The Court declines to adopt a *per se* rule that Plaintiffs need not prove loss causation in such a case. *Compare Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767, 773–74 (9th Cir.1984) (a plaintiff need not prove causation where the evil alleged is the purchase of securities rather than a decline in price) *and Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1486 n. 7 (9th Cir.1991) (limiting *Hatrock* to "churning cases"). This rule would be inconsistent with PSLRA. *See* 15 U.S.C. § 78u–4(b)(4). However, where the issue is the sale of sham investments rather than an overvaluation of legitimate investments, it seems prudent to adopt a broad interpretation of the "loss causation" requirement. *See* HAZEN, *supra*. ("whether the broad or narrow approach applies depends upon the factual context," proffering a *per se* rule in inducement cases).

 At base, the "loss causation" requirement incorporates the tort principle of proximate cause. *See Ambassador Hotel Co., Ltd. v. Wei–Chuan Inv.*, 189 F.3d 1017, 1025 (9th Cir.1999) ("The plaintiff must prove both actual cause ['transaction causation'] and proximate cause ['loss causation']") (citation omitted). It is plain from the allegations in the complaint that the economic loss allegedly sustained was the diversion of investor funds to Halstead and others. Essential to this diversion of funds was the solicitation of new and "rolled-over" investment. According to the allegations in the complaint it was entirely foreseeable—indeed intended—that the principals of the PIPES scheme would divert the funds of these investors. Accordingly, it was at least foreseeable to Halstead, at the time he made the initial interest payments, that these payments would cause investors to invest monies in valueless securities that would eventually be looted by Rowzee and others. This is sufficient to demonstrate that Halstead's interest payments were both the actual ("transaction") and proximate ("loss") cause of the harm to investors.

## C. Scienter

Finally, Defendants argue that Plaintiffs have failed to allege sufficient and particular pieces of circumstantial evidence that give rise to a "strong inference" of scienter. *See* 15 U.S.C. § 78u–4(b)(2). The Court must take a "holistic approach" to the specifically pleaded allegations in the complaint and, considering all competing

inferences, determine whether they give rise to a "cogent and compelling" inference that Halstead acted intentionally or with deliberate recklessness. *Tellabs,* 127 S.Ct. at 2509–10; *Silicon Graphics,* 183 F.3d at 974.

Halstead suggests that his conduct was innocent and that he too was duped by Rowzee's scheme. Plaintiff, on the other hand, asks the Court to infer that Halstead was in on the scheme. A number of facts specifically alleged in the complaint counsel in favor of a finding that Halstead acted with scienter in paying returns on initial investment.

 Plaintiff correctly points out that Halstead, as a licensed insurance agent, was likely more sophisticated than an average investor. SAC ¶ 26. It seems unfathomable that a licensed professional, capable of setting up two companies as investment vehicles and handling millions of dollars in investments would have been duped into believing that Rowzee was making legitimate investments with the funds. The inference of scienter is particularly compelling given the extraordinary nature of the promised returns and those actually paid. *See id.* Ex. 3 (promising 37% interest after 16 weeks); *compare* ¶¶ 35 and 37. The ruse at issue, while somewhat technical, was not so opaque that a sophisticated investor would not recognize it for what it was, particularly given Halstead's level of involvement.

Halstead was not a passive investor but was instrumental in drawing investment, including investment through companies he owned and controlled. *Id.* ¶ 35. The fact that he both solicited investment and distributed the interest payments suggests that, at minimum, he was deliberately reckless to the fact that he was involved in a Ponzi scheme. Additionally, the suspicious funds transfers between Halstead, Harvey, and Rowzee, support the inference that Halstead acted with scienter.

*Id.* ¶ 49. For instance, on December 12, 2006, GamePlan wired $531,433.35 to Rowzee's account and Rowzee wired the same amount to Halstead, which Halstead used to close escrow on a home. *Id.*

While the Court might draw the inference that Halstead was a victim along with Plaintiffs, such an inference is not as compelling as the inference that Halstead knew of the fraud and helped it along by providing interest payments to early investors. This being so, Plaintiffs have adequately pleaded scienter.

## IV. DISPOSITION

Defendants' Motion to Dismiss Plaintiffs' claim under § 10(b) of the Securities and Exchange act and Rule 10b–5 promulgated thereunder is hereby DENIED.

Because the Court declines to dismiss Plaintiffs federal claim against Halstead, it also declines to dismiss the state causes of action. *See* 28 U.S.C. § 1367.

IT IS SO ORDERED.