# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2543

_____

|  |  |  |
|---|---|---|
| | * | |
| In re: Navarre Corporation | * | |
| Securities Litigation | * | |
| | * | |
| | * | |
| | * | |
| Daniel Chen, on behalf of himself | * | |
| and all others similarly situated, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| Judy Poucher, on behalf of herself | * | Appeal from the United States |
| and all others similarly situated, | * | District Court for the District |
| | * | of Minnesota. |
| Plaintiff, | * | |
| | * | |
| Advanced Data Concepts; Steve | * | |
| Chahine; Lee Tachman, | * | |
| | * | |
| Plaintiffs - Appellants, | * | |
| | * | |
| v. | * | |
| | * | |
| Navarre Corp.; Eric H. Paulson; | * | |
| Charles E. Cheney; Alfred Teo; | * | |
| Dickinson G. Wiltz; James G. Sippl; | * | |
| Michael L. Snow, | * | |
| | * | |
| Defendants - Appellees. | * | |

_____

Submitted: March 13, 2002

Filed: July 31, 2002
_____

Before FAGG, BEAM, Circuit Judges, GOLDBERG,[1] Judge.
_____

BEAM, Circuit Judge.

The issue before us is whether the amended complaint in this securities fraud class action states a claim under the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u- 4(b)(1)- (2). The district court[2] held that it did not, and dismissed the amended complaint with prejudice. The plaintiffs appeal, and we affirm.

## I.    BACKGROUND

This action is brought under sections 10(b) and 20 of the Securities Exchange Act of 1934 ("Act"), 15 U.S.C. §§ 78j(b) and 78t, and Rule 10b-5 of the Securities Exchange Commission, 17 C.F.R. § 240.10b-5 ("Rule"). The plaintiffs ("investors") allege violations of the Act and Rule on behalf of a class of investors who bought Navarre stock between November 25, 1998, and July 26, 1999 (the "class period"). The defendants are the Navarre Corporation and certain of its officers and directors. For the purpose of a motion to dismiss, we assume that the facts alleged in the amended complaint are true. Florida State Bd. of Admin. v. Green Tree Financial Corp., 270 F.3d 645, 648 (8th Cir. 2001).

_____

[1]The Honorable Richard W. Goldberg, Judge of the United States Court of International Trade, sitting by designation.

[2]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

Navarre is a major distributor of music, software and interactive CD-ROM and DVDs. Through its subsidiary, NetRadio Corporation, Navarre also owns and operates NetRadio Network, a leading audio content provider on the Internet. Eric Paulson has been the Chairman of the Board of Directors and President and Chief Executive Officer of Navarre since 1983. The other named defendants in this action are officers or members of the Board of Directors. On May 1, 1996, Navarre purchased a fifty percent interest in NetRadio, and the following year Navarre purchased the other half of NetRadio. The NetRadio purchase capped a successful five years during which Navarre grew from $20 million in sales in 1991 to $200 million in 1996. However, the NetRadio purchase drained Navarre's working capital, forcing officials to raise $20 million through a private placement in May 1998.

As early as July 1998, Navarre hoped to take advantage of the lucrative Internet market by taking NetRadio public. According to the investors, Navarre stood to benefit from such an IPO because NetRadio was valued by Navarre as a zero asset on its books. In the months leading up to the class period, the defendants increased the number of public announcements about Navarre and ultimately began making announcements about the NetRadio IPO. On July 27, 1998, NetRadio issued a press release stating that it intended to file a registration statement with the SEC for an IPO of NetRadio common stock. However, a depressed market put NetRadio's IPO plans on hold until October and November, the time at which the class period begins.

In the amended complaint, the investors allege several fraudulent schemes. First, the investors allege that Navarre issued false and misleading statements that it was in the final stage of spinning off a majority-owned subsidiary and taking the newly formed company public by the end of the year 1998, which created heightened demand for Navarre stock - the "NetRadio Hype." Second, the investors allege that Navarre participated in a "ship and store" scheme that artificially inflated Navarre's stock price. Both of these schemes, according to the investors' amended complaint,

artificially inflated Navarre's stock price and allowed the individual defendants to sell Navarre stock at a large profit.

### A.    The NetRadio Hype

The amended complaint sets forth many public statements made by Navarre regarding the NetRadio IPO during the class period.  The investors pinpoint the following statements and allege that the defendants, in each instance, knew or were reckless in not knowing that the statements were false:

(1) In November 1998, Navarre began making public statements that it would complete the NetRadio IPO by the end of the year 1998, which created heightened demand for Navarre stock.  Investors also allege that Paulson said the IPO would happen "soon."

(2) On November 27, 1998, after Paulson allegedly confirmed efforts to sell NetRadio shares in a public offering, the price of Navarre stock more than doubled to $12.1875.

(3) On November 30, 1998, a transcript from CNNfn states "[t]he company has publicly admitted that it is working to bridge NetRadio out as an IPO before the end of the year.  Spoke with a company spokesmen [sic] who did confirm that the company is trying to bring the IPO out."  The identity of the speaker was not disclosed by CNNfn.

(4) On December 8, 1998, a Navarre spokeswoman confirmed that Navarre would spin off NetRadio, but said Navarre had not yet registered a filing with the SEC.

(5) On December 9, 1998, Paulson told a reporter with CNBC that in order to spin off NetRadio in an IPO, Navarre would have to file documents with the SEC and may need shareholder approval. Additionally, Paulson announced Navarre had retained Everen Securities, Inc. to complete the IPO within 60 days.

(6) In December 1998 or January 1999, rather than correcting the information, Paulson held a conference saying he was "reasonably comfortable" that the NetRadio IPO would occur by early February. Navarre stock traded above $15 per share at that time.

(7) On February 3, 1999, a story from the *Minneapolis Star Tribune* stated that Navarre was expected to file a registration statement with the SEC early the following week. A spokesman for Navarre declined to comment. Navarre stock surged to at or above $20 per share.

(8) On February 8, 1999, Navarre retreated from the previous announcement but still confirmed plans for an IPO within the next several weeks.

(9) On March 3, 1999, NetRadio filed a registration statement but the investors allege that Navarre stopped discussing the IPO altogether at that time and Navarre's stock began a downward trend beginning in late May 1999.

(10) By June 4, 1999, Navarre stock traded at $9 per share. Navarre's June 29, 1999, 10-K reported that "there can be no assurance that [NetRadio] will successfully complete the offering."

(11) On July 26, 1999, Navarre disclosed that the NetRadio IPO would not occur before September and that Navarre was interviewing new investment bankers to replace Everen Securities, which was in the midst of its own pending acquisition

announced April 27, 1999. The investors allege that at that time Everen Securities had completed almost no work on the NetRadio IPO.

(12) NetRadio ultimately completed its IPO on October 14, 1999.

## B.     The Ship and Store Scheme

In addition to the above-mentioned "NetRadio Hype" scheme, the investors also allege that "[b]y utilizing improper accounting practices, defendants reported revenues on products that had been shipped to warehouses, as opposed to purported customers of [Navarre] - even though defendants anticipated most of the products would be returned and had no expectations that [Navarre] would be paid." This scheme, the investors state, contributed to the artificial inflation of Navarre's stock during the class period and allowed the individual defendants to sell large portions of their company stock, realizing great profits.

The investors allege that in order to compensate for revenue shortfalls between what Navarre had publicly forecast and Navarre's actual sales, defendants implemented a scheme to meet or exceed projected sales. This was accomplished by increasing Navarre's product offerings, or "label list," and inducing customers to sign "ship and store" agreements that allowed Navarre to ship product offerings to a storage facility and invoice the customer as if the customer had received the products. Further, it is alleged that Navarre authorized its sales managers to offer the customer free shipping, allowed them to waive the order down payment and assure customers that they would not have to pay the invoice until the product was actually received. By doing this, defendants were able to report a growing volume of sales transactions and record them as revenue throughout the fiscal year. The investors allege that this scheme violated many Generally Accepted Accounting Principles ("GAAP") and ultimately unraveled when the stored products failed to yield revenue or the

-6-

merchandise was returned to Navarre's possession. As a result, Navarre reported a $25.57 million loss in 1999, which the investors attribute to anticipated sales returns.

### C.     Insider Sales

According to the investors, the alleged wrongdoing resulted in an avalanche of insider trading as the individual defendants began to liquidate their stock holdings in the company. Specifically, the individual defendants sold a total of 474,470 shares of their 3,965,257 combined stock ownership, or about twelve percent of their Navarre stock, realizing $11.5 million in proceeds.

The district court dismissed the appellant's amended complaint, holding that (1) investors failed to plead facts supporting the "ship and store" scheme with sufficient particularity because they failed to provide the who, when, where or how of the alleged fraud scheme, (2) investors did not allege facts to support their assertion under the "NetRadio Hype" theory that the statements attributable to defendants were false when made because the investors merely set forth blanket assertions that the statements were false without providing a supporting factual basis for same; (3) investors failed to plead entanglement by the defendants with any statements by reporters or analysts, (4) investors failed to sufficiently plead any material misrepresentation by defendants, (5) investors failed to plead facts creating a strong inference of scienter on the part of defendants as required by the PSLRA, and (6) because investors failed to present an actionable claim under 10(b) or 10b-5, the section 20(a) claim was necessarily dismissed.

## II.   DISCUSSION

### A.   Standard of Review

"We review *de novo* a district court's order dismissing a complaint on the pleadings and accept as true all facts alleged in the complaint." Novak v. Kasaks, 216 F.3d 300, 305 (2d Cir.), cert. denied, 531 U.S. 1012 (2000).  Whereas the court "must accept as true all of the complaint's factual allegations and view them in the light most favorable to the plaintiff,"  Kohl v. Casson, 5 F.3d 1141, 1148 (8th Cir. 1993), "under the Reform Act, we disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute."  Florida State Bd. of Admin., 270 F.3d at 660.

> [U]nder the Reform Act, a securities fraud case cannot survive unless its allegations collectively add up to a strong inference of the required state of mind.  "Congress has effectively mandated a special standard for measuring whether allegations of scienter survive a motion to dismiss. While under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable . . . .  Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences."

 Id. (quoting Greebel v. FTP Software, Inc., 194 F.3d 185, 195-96 (1st Cir. 1999)).

### B.   Securities Fraud Pleading Standard

Rule 10b-5, promulgated by the Securities and Exchange Commission under section 10(b) of the Act, prohibits fraudulent conduct in the sale and purchase of securities.  15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5; Florida State Bd. of Admin., 270 F.3d at 653; In re NationSmart Corp. Sec. Litig., 130 F.3d 309, 320 (8th Cir. 1997). Section 20 of the Act extends liability under section 10(b) and Rule 10b-5 to any

"controlling person." 15 U.S.C. § 78t(a). Rule 10b-5 provides that it is unlawful for any person, directly or indirectly:

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

"Standing under § 10(b) and Rule 10b-5 requires a showing of (1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit; (2) causation, often analyzed in terms of materiality and reliance; (3) damages; and (4) fraudulent activity occurring in connection with the purchase and sale of a security." Alpern v. UtiliCorp United, Inc., 84 F.3d 1525, 1533-34 (8th Cir. 1996). "Although not explicitly mentioned in the text of the rule, scienter is nevertheless an essential element of a Rule 10b-5 claim." Florida State Bd. of Admin., 270 F.3d at 653. Scienter means the intent to deceive, manipulate, or defraud. In re NationsMart Corp. Sec. Litig., 130 F.3d at 320 (citation omitted).

To determine whether the facts pleaded in the amended complaint are adequate, we review them in light of the pleading standard the investors have to satisfy. Complaints brought under Rule 10b-5 and section 10(b) are governed by special pleading standards adopted by Congress in the PSLRA. These pleading standards are unique to securities and were adopted in an attempt to curb abuses of securities fraud litigation. Florida State Bd. of Admin., 270 F.3d at 654. Congress enacted two

heightened pleading requirements for securities fraud cases. "The first requires that the complaint specify each false statement or misleading omission and explain why the omission was misleading. 15 U.S.C. § 78u-4(b)(1) [1997]. The second requires that the complaint state 'with particularity' facts giving rise to a 'strong inference' that the defendant acted with the scienter required for the cause of action. 15 U.S.C. § 78u-4(b)(2) [1997]." Id.

Prior to the enactment of the PSLRA, pleadings were evaluated under Federal Rule of Civil Procedure 9(b) for particularity. Parnes v. Gateway 2000, Inc., 122 F.3d 539, 549 (8th Cir. 1997). Contrary to the district court's analysis, the investors technically do not need to meet the requirements of *both* Federal Rule of Civil Procedure 9(b) and the PSLRA, as the PSLRA supercedes reliance on 9(b) in securities fraud cases and embodies the standards of 9(b). Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1034 n.12 (9th Cir. 2002) (noting that the PSLRA changed the pleading requirements in private securities fraud litigation previously governed by 9(b) by requiring that a complaint plead with particularity both falsity and scienter); City of Philadelphia v. Fleming Co., 264 F.3d 1245, 1255 n.13 (10th Cir. 2001) ("The scienter pleading requirements of the PSLRA supercede the provisions of Rule 9(b) in securities fraud cases.") (citation omitted); Greebel, 194 F.3d at 193 ("The effect of [the PSLRA] is to embody in the Act itself at least the standards of Rule 9(b), Fed. R. Civ. P."). Specifically, the PSLRA requires that both falsity and scienter be pleaded with particularity. Under 9(b), "[m]alice, intent, knowledge, and other condition of mind of a person [could] be averred generally". Fed. R. Civ. P. 9(b). With these standards in mind, we turn to the adequacy of the investors' pleadings.

## C. NetRadio Hype

### 1. Direct Statements

The first heightened pleading requirement Congress enacted for securities fraud cases under 10b-5 is that the complaint must specify each false statement or misleading omission and explain why the omission was misleading. 15 U.S.C. § 78u-4(b)(1). "The purpose of this heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading 'fraud by hindsight.'" In re Vantive Corp., 283 F.3d at 1084-85 (quoting In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 988 (9th Cir. 1999)). The investors fail to plead the existence of any facts or further particularities that, if true, demonstrate that the defendants had access to, or knowledge of, information contradicting their public statements when they were made.

Mere allegations of fraud are insufficient, even under the pre-PSLRA pleading standard. See Parnes, 122 F.3d at 549. Some of the direct statements alleged to be fraudulent by the investors are: Paulson's November 25, 1998, statement that Navarre had hired an undisclosed investment bank to take its NetRadio unit public soon; statements attributed to "defendants" generally that Navarre would complete the NetRadio IPO by the end of the year; Paulson's December 9, 1998, statement to CNBC that Navarre planned to file a registration statement within sixty days; Paulson's January 1999 statement during a conference call that he was reasonably comfortable that the NetRadio IPO would occur by early February 1999; and the allegation that on February 8, 1999, the defendants retreated from a prior announcement but still confirmed plans for an IPO within the next several weeks. Any remaining allegations concern statements made by analysts and news reporters, which the investors allege represent a direct statement or quotation by a Navarre insider or an endorsement of or failure to correct widely disseminated reports.

The general allegations contained in the amended complaint are inadequate under the heightened pleading standard of the PSLRA. The amended complaint fails to indicate why these statements would have been false or misleading at the several points in time in which it is alleged they were made. See In re Vantive Corp., 283 F.3d at 1086. Simply alleging that defendants made a particular statement at a given time, without providing further particulars about who made the statement or when, and then showing in hindsight that the statement is false misses the PSLRA pleading requirement. "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonable available to them." Novak, 216 F.3d at 309. For example, the investors allege in paragraph thirty-four of the amended complaint that "[d]efendants knew or were reckless in not knowing that it would be impossible to file even a registration statement until March 1999," but give no particulars as to why this must be true. Why would the defendants have known of this impossibility? The failure to plead this "why" with particularity in this example is indicative of the failings of the investors' amended complaint. In sum, the investors' failure to plead their allegations of fraudulent misstatements and omissions with particularity is insufficient and fatal under the PSLRA.

## 2. Navarre's Liability for Statements by Analysts

The representations made by third parties that the investors attribute to Navarre are also insufficient under the PSLRA pleading standard. Generally, securities issuers are not liable for statements or forecasts disseminated by securities analysts or third parties unless they have "sufficiently entangled [themselves] with the analysts' forecasts [so as] to render those predictions 'attributable to [the issuers].'" Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 163 (2d Cir. 1980). In order to attribute third-party statements to the defendants, the investors must demonstrate that the statements were adopted by the defendants or attributable to the defendants in some way, such as when officials of a company "have, by their activity, made an implied representation that the information they have reviewed is true or at least in

accordance with the company's views." Id.  The investors could also allege that the defendants used the analysts as a conduit, making false and misleading statements to securities analysts with the intent that the analysts communicate those statements to the market.  Cooper v. Pickett, 137 F.3d 616, 624 (9th Cir. 1997).

The investors allege in paragraph thirty of the amended complaint that "defendants began making public statements that it would complete the NetRadio IPO by the end of the 1998 year," and attach Exhibit C as substantiation of that representation.  Exhibit C is a transcript from a CNN financial news program, on which CNN correspondent Bill Tucker stated:

> The company has publicly admitted that it is working to bridge NetRadio out as an IPO before the end of the year.  Spoke with a company spokesmen [sic] who did confirm that the company is trying to bring the IPO out.

The investors fail to allege any facts demonstrating why this statement was false when made, or how this report is in any way attributable to the defendants other than the article's assertion that "the company has publicly admitted" this fact.

Another example of the insufficiency appears in paragraph thirty-seven of the amended complaint where the investors allege that "[o]n February 3, 1999, Navarre announced that it expected to file a registration statement with the SEC early the following week."  To substantiate this claim, investors attach a related news article reporting this representation.  However, the attached news article printed in the February 3, 1999, edition of the *Minneapolis Star Tribune* states that a spokesman for Navarre declined to comment on their story.  So, it is not clear who made the alleged announcement, where it was made, what it entailed, when it was made, why it was false when made or how plaintiffs are able to substantiate the allegation other than through an independent news source story.  This pattern of pleading, which is

consistent throughout the investors' amended complaint, is hardly the stuff of particularity.

**D.     The Ship and Store Scheme**

The investors further allege in their amended complaint that the defendants engaged in a "ship and store" scheme in an attempt to complement the previously discussed "NetRadio Hype" scheme. "By reporting sales increases the market would respond favorably to the Company's stock price and, once the stock price was driven upward, the Individual Defendants had an opportunity to unload their shares at artificially inflated prices."

The investors argue that they need not plead the exact amounts of the overstatements and/or the precise details of each specific transaction especially where the subject matter of the fraud is uniquely within the defendants' knowledge or control.  While true, the investors must still allege with particularity the alleged fraudulent revenue recognition scheme.  In re Vantive Corp., 283 F.3d at 1091.

The investors rely on Cooper to support their allegations that the defendants overstated Navarre's revenue, claiming the facts in Cooper virtually identical. However, Cooper was decided prior to the effective date of the PSLRA, and applied the particularity requirements of Federal Rule of Civil Procedure 9(b) for allegations of fraud.  In re Vantive Corp., 283 F.3d at 1091.  "The stricter standard for pleading scienter naturally results in a stricter standard for pleading falsity, because 'falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts,' and the two requirements may be combined into a unitary inquiry under the PSLRA."  Id. (quoting Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir. 2001)).  As such, Cooper is not apposite, but certainly provides guidance, because as stated previously, the heightened pleading requirements under the PSLRA embody the prior standards of Federal Rule of Civil Procedure 9(b).

In this case, the investors fail under either the pre-PSLRA or post-PSLRA pleading requirements. The plaintiffs in <u>Cooper</u>, as the investors point out, alleged the who, what, when, where and how of the alleged revenue recognition fraud. The plaintiffs in <u>Cooper</u> provided names of clients, listed the dollar amounts of overstatements of revenues, net income, and earnings per share during particular quarters. <u>Cooper</u>, 137 F.3d at 626-27. The investors in this case have not come close to reaching this level of particularity. The investors only allege in their amended complaint that the defendants ensured that Navarre reported consistent revenue gains quarter after quarter by employing a scheme whereby Navarre increased its product list and engaged in a "ship and store" marketing scheme, which the investors generally describe. These allegations are insufficient. It is true that the investors need not describe in detail a single specific transaction or shipment carried out under this alleged scheme, <u>id.</u> at 627, but the investors must plead with particularity the who, what, when, where and how of this alleged scheme. This amended complaint is devoid of any details regarding time, persons, places, and subjects. <u>In re Vantive Corp.</u>, 283 F.3d at 1091.

Indeed, the investors plead with particularity that this alleged scheme violates GAAP, but this is not enough. Allegations of GAAP violations are insufficient, standing alone, to raise an inference of scienter. <u>Novak</u>, 216 F.3d at 309. Only where these allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient. <u>Id.</u>

### E.    Scienter

The PSLRA requires that the complaint state "with particularity" facts giving rise to a "strong inference" that the defendants acted with the scienter required for the cause of action. 15 U.S.C. § 78u-4(b)(2). There is disagreement among the circuits concerning the meaning of the strong-inference-of-scienter pleading standard and what it means in terms of the level of particularity now required to sufficiently plead

scienter under the PSLRA. See Florida State Bd. of Admin., 270 F.3d at 654-60 (dividing the circuits that have interpreted the Reform Act into at least three camps).

Stated simply, we view the investors' amended complaint to determine whether they set forth facts that give a *strong* reason to believe that there was reckless or intentional wrongdoing. See id. at 659. This standard is not satisfied by any one particular method, such as the motive-and-opportunity formulation adopted by the Second Circuit, see Novak, 216 F.3d at 307-12, but rather through various criteria developed throughout the circuits that look for badges of fraud. See Helwig v. Vencor, Inc., 251 F.3d 540, 552 (6th Cir. 2001) (setting forth nine factors usually relevant to scienter), cert. dismissed, No. 01-538, 2002 WL 1352425 (June 20, 2002); Greebel, 194 F.3d at 196-98 (same);. "The Reform Act itself adopted only the strong-inference-of-scienter standard, without codifying the particular methods of satisfying the standard." Florida State Bd. of Admin., 270 F.3d at 659-60. Certainly, the pre-PSLRA body of law is instructive and we look to this case law for guidance. See id. at 657-60 (setting forth the congressional history and recognizing that the codification of the PSLRA occurred as a result of a review of the then-existing body of law dealing with each circuit's pleading requirements regarding scienter).

The investors contend that a strong inference of scienter can be pleaded by allegations of either conscious or reckless conduct, including motive and opportunity on the part of defendants to commit fraud *or* facts constituting strong circumstantial evidence of conscious behavior or recklessness. The defendants contend that the investors fail to meet both the particularity requirement and the strong inference requirement under the PSLRA because the investors merely make rote allegations that the defendants knowingly made false statements of material fact.

In the amended complaint, the investors set forth allegations regarding defendants' motive and opportunity. "Motive and opportunity" is a term of art, "meaning something far narrower than what it appears to mean," and is not per se

required under the heightened PSLRA pleading requirements. Id. at 656 (setting forth a thorough analysis of how this standard evolved in the Second Circuit and its potential impact on the drafting of the PSLRA). In Florida State Board of Administration, we stated the position of this circuit regarding allegations of motive and opportunity:

> First, motive and opportunity are generally relevant to a fraud case, and a showing of unusual or heightened motive will often form an important part of a complaint that meets the Reform Act standard. Second, in some cases the same circumstantial allegations that establish motive and opportunity also give additional reason to believe the defendant's misrepresentation was knowing or reckless. . . . Third, when the complaint does not show motive and opportunity of any sort–either the unusual, heightened motive highlighted in the Second Circuit cases, or even an everyday motive such as keeping one's job–then other allegations tending to show scienter would have to be particularly strong in order to meet the Reform Act standard.

Id. at 660. In sum, we look to how other circuits have interpreted the strong-inference-of-scienter language as valuable guidance about what factors help to establish such an inference, but "take care to use subsidiary formulae as an aid to interpreting the strong-inference standard and not as a substitute for it." Id.

The investors' amended complaint sets forth facts regarding the defendants' motive and opportunity to commit the acts alleged. However, they effectively allege nothing more than the fact that the defendants, being highly ranked executives and officers of Navarre, have self-serving motives for the company to appear profitable. This is not the intent of the "motive and opportunity" standard, even as adopted by the Second Circuit, and is insufficient in establishing a strong inference of scienter under the PSLRA. Id. at 655 (recognizing that greed is a ubiquitous motive, and as such, under a broad "motive and opportunity" pleading standard, corporate insiders and upper management always have the opportunity to lie and manipulate); see also

-17-

Novak, 216 F.3d at 307 (reiterating that motives possessed by virtually all corporate insiders are not sufficient, including the desire to maintain a high corporate credit rating or the appearance of corporate profitability, and the desire to maintain a high stock price in order to increase executive compensation).

One "classic" fact pattern giving rise to a strong inference of scienter is that defendants made statements when they knew or had access to information suggesting these public statements to be materially inaccurate. Florida State Bd. of Admin., 270 F.3d at 665 (finding the plaintiffs' allegations of scienter sufficient because the investors alleged that defendants published statements with knowledge of specific facts, set forth in the complaint, indicating that crucial information in the statements was based on discredited assumptions). In the instant case, the investors fail to allege any facts whatsoever regarding why the defendants' speculations about the NetRadio IPO timing were materially inaccurate. As such, the amended complaint fails under the heightened pleading standard of the PSLRA.

Finally, the investors allege that the defendants' stock sales provide further proof of their fraudulent scheme. We review these allegations under the scienter pleading standard because insider sales are probative of motive, which may provide circumstantial evidence of scienter. Id. at 656 ("[I]n the insider trading case, trading at a particular time is circumstantial evidence that the insider knew the best time to trade because he or she had inside information not shared by the public. This in turn is circumstantial evidence that he or she kept the information from the public in order to trade on the unfair advantage."); Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. 1999) (recognizing under the pre-PSLRA standard that unusual insider trading activity during the class period may permit an inference of bad faith and scienter).

"Insider stock sales are not inherently suspicious; they become so only when the level of trading is 'dramatically out of line with prior trading practices at times

-18-

calculated to maximize the personal benefit from undisclosed inside information.'" In re Vantive Corp., 283 F.3d at 1092 (quoting Ronconi, 253 F.3d at 435). "[C]omplaints based on insider trading must allege more than that the defendant benefitted from trading because of a false statement or misleading omission; the insider trades have to be 'unusual,' either in the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved, before they will give rise to the required inference of scienter." Florida State Bd. of Admin., 270 F.3d at 659.

The investors allege that during the class period, the individual defendants sold the following shares, stated in relation to their total holdings: Paulson sold ten percent during a four-month period; Cheney sold thirty-five percent during a four-month period; Teo sold thirty-two percent during a four-day period; Wiltz sold twenty-three percent in one day; Sippl sold one hundred percent during a two-day period; and Snow sold one hundred percent during a period of a few days.

While the sale of ten percent or even thirty-two percent of an individual's stock interest during a class period fails to substantiate a strong inference of scienter in these circumstances, standing alone, the sale by Sippl and Snow of all of their shares is certainly disconcerting, as well are the facts that individual defendants sold a substantial portion of their shares within a relatively short period of time corresponding directly with the alleged IPO promises, and the fact that *all* of the defendants engaged in such sales around the time of the alleged scheme. Put together, these insider sales may be characterized as unusual.

The First Circuit revisited the substantive evidentiary requirements for an inference of scienter after the passage of the PSLRA. See Greebel, 194 F.3d at 196. As we stated above, an allegation that defendants had the motive and opportunity to make false or misleading statements is insufficient to support the strong inference of scienter required after the PSLRA. As stated by the First Circuit, "a plaintiff must

-19-

allege some additional misconduct from which a jury can draw a reasonable inference of intentional deception." Geffon v. Micrion Corp., 249 F.3d 29, 36 (1st Cir. 2001).

> Evidence we have found relevant to the scienter issue includes: insider trading in conjunction with false or misleading statements; a divergence between internal reports and public statements; disclosure of inconsistent information shortly after the making of a fraudulent statement or omission; bribery by top company officials; evidence of an ancillary lawsuit, charging fraud, which was quickly settled; disregard of current factual information acquired prior to the statement at issue; accounting shenanigans; and evidence of actions taken solely out of self-interest.

Id. (citing Greebel, 194 F.3d at 196) (compiling First Circuit cases). We adopt this reasoning under the PSLRA standard.

The motive and opportunity allegations substantiated by specific allegations of insider sales, including the trading history of these individuals, do provide circumstantial evidence of scienter in this case. However, this alone is insufficient to meet the "strong-inference-of scienter" evidentiary standard. This trading must coincide with false or misleading statements–a missing link in this case. "Absent additional evidence, it is not possible to draw a strong inference of scienter based on improper trading on material, non-public information." Greebel, 194 F.3d at 207. "In addition to pleading scienter, it is well-established that a securities fraud complaint must also plead certain facts with particularity in order to state a claim." Novak, 216 F.3d at 306. As was fatal to the investors' pleadings earlier, their failure to support an allegation that the defendants knew the statements were misleading or false, or even that the alleged statements are attributable to the defendants is glaringly absent. Thus, the investors fail to plead with the requisite particularity under the PSLRA.

## III.   CONCLUSION

Looking at the face of the amended complaint and drawing all inferences in favor of the investors as we must in reviewing a motion to dismiss, we hold that the investors failed to satisfy the heightened pleading requirements of the PSLRA. Specifically, the investors failed to plead with particularity the alleged misleading statements and omissions of the defendants, and the investors failed to plead with particularity the requisite state of mind as required by the PSLRA.  Finally, because the investors failed to present an actionable claim under 10(b) or 10b-5, the section 20(a) claim is not actionable.  Accordingly, we affirm.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.