SAUNDRA BROWN ARMSTRONG, Senior United States District Judge
The Federal Trade Commission ("FTC") brings the instant consumer fraud action against Defendants American Financial Benefits Center ("AFBC"), Ameritech Financial ("Ameritech"), Financial Education Benefits Center ("FEBC"), and Brandon Frere ("Frere") (collectively, "Defendants"). The matter is presently before the Court on Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. 117. Having read and considered the papers filed in connection with this matter, and being fully informed, the Court hereby DENIES the motion, for the reasons stated below.[1]
I. BACKGROUND
A. THE PARTIES
The FTC is an independent agency of the United States government. Compl. ¶ 4, Dkt. 1. The FTC is charged with the enforcement of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 41 et seq. , which prohibits, inter alia , "unfair or deceptive acts or practices in or affecting commerce." Id. § 45(a)(1). The FTC is also charged with the enforcement of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. §§ 6101 et seq. Pursuant to its authority under the Telemarketing Act, the FTC promulgated the Telemarketing Sales Rule ("TSR"), 16 C.F.R. pt. 310, which prohibits deceptive or abusive telemarketing acts or practices. See 15 U.S.C. § 6102(a) ; 16 C.F.R. pts. 310.3 - 310.4. A violation of the TSR constitutes a *1072 violation of the FTC Act. See 15 U.S.C. §§ 57a, 6102(c).
AFBC was incorporated in California in February 2011. Compl. ¶ 6. Ameritech and FEBC were incorporated in California in October 2015. Id. ¶¶ 7-8. Frere is the founder, CEO, and majority owner of AFBC, Ameritech, and FEBC (collectively, "the Companies"). Id. ¶ 9. Defendants transact or have transacted business in this district and throughout the United States. Id. ¶¶ 6-9. Specifically, the Companies have "advertised, marketed, distributed, or sold student loan debt relief services to consumers throughout the United States." Id. ¶¶ 6-8. In conducting the business practices at issue in this action, the Companies have operated as a common enterprise. Id. ¶ 10. Frere "formulated, directed, controlled, had the authority to control, or participated in the acts and practices" of the Companies that constitute the common enterprise. Id.
B. STUDENT LOAN FORGIVENESS AND REPAYMENT PROGRAMS
To address elevated levels of distressed student loan debt, the Department of Education ("DOE") and state government agencies administer a limited number of loan forgiveness and discharge programs. Compl. ¶ 15. These programs include Public Service Loan Forgiveness ("PSLF") and income-driven repayment ("IDR"). Id. ¶¶ 16-17.
IDR programs enable borrowers to reduce their monthly payment and have portions of their loans forgiven. Id. ¶ 17. Specifically, IDR allows eligible borrowers to limit their monthly payments based on a percentage of their discretionary monthly income. Id. To remain in an IDR program, borrowers must recertify their income and family size annually. Id. Because a borrower's income likely fluctuates over the life of the loan, monthly payments under an IDR program can vary considerably from year to year. Id. ¶ 18. If a borrower's income increases over the repayment period, for example, monthly payments can correspondingly increase, such that the loan is paid off before any amount can be forgiven. Id. Obtaining loan forgiveness through an IDR program requires a minimum of 20 or 25 years of qualifying payments. Id. ¶ 17. As of September 2017, no loans had been forgiven under an IDR program. Id.
Consumers can apply for the PSLF, IDR, and other loan repayment and forgiveness programs through the DOE or their student loan servicer at no cost; these programs do not require the assistance of a third-party company or the payment of application fees. Id. ¶ 19. The DOE will grant forbearance while processing applications for an alternative repayment plan and in some cases of hardship. Id. ¶ 20. During forbearance, unpaid interest is added to the principal balance. Id.
C. DEFENDANTS' BUSINESS PRACTICES
It is alleged that, since 2014 and continuing thereafter, Defendants have operated a "debt relief enterprise that has tricked consumers out of millions of dollars." Compl. ¶ 12. Defendants distribute mailers claiming that consumers are eligible for federal loan assistance programs that would permanently reduce their monthly loan payments to a fixed amount or result in total loan forgiveness. Id. Defendants collect an advance fee of $600 to $800, purportedly to enroll consumers in these programs. In numerous instances, the consumer was not enrolled in the promised program. Id. In some instances, not only was the consumer's loan balance not reduced, but it also continued to accrue interest. Id. In addition to advance fees, Defendants also collect and retain monthly fees that consumers believe are applied to pay down their loans, but actually go toward membership in a "financial education"
*1073 program that includes access to various services unrelated to their student loans. Id. ¶ 13. Defendants have collected over $28 million from consumers. Id.
1. Marketing of Student Loan Debt Relief Services
In marketing their services, Defendants have disseminated, or caused to be disseminated, personalized mailers to consumers throughout the United States. Compl. ¶ 22 & Exs. A-E (mailers). According to the FTC, the mailers contain many deceptive statements. Id. For example, many mailers state that the consumer has been "pre-qualified" to reduce their payments through the "Student Loan Document Preparation and Processing Services Program." Id. Mailers also include specific dollar amounts for the reduced payments, payoff amount, and total loan savings. Id. Mailers do not advertise or describe a monthly membership to any service. Id. ¶ 23.
As alleged by the FTC, the mailers "create a sense of urgency" by indicating that the offers are available for a limited time. Id. ¶ 24, e.g., Ex. C ("Failure to respond to this letter may cancel the offer for services. "). Mailers often do not include the Companies' names. Id. ¶ 25. Instead, they purport to be from the "Student Loan Department" or the "Student Loan Payment Reduction Dept." Id. Mailers include a toll-free phone number where consumers can reach Defendants. Id. ¶ 26. The recorded message that consumers hear while waiting to be connected to a sales agent has stated: "You have reached the program enrollment department," and "[T]o speak with an account specialist regarding an important notice you've received, please stay on the line." Id.
Defendants advise consumers that their new monthly payment amount will apply for 10 or 20 years, after which time their remaining loan balances will be forgiven. Id. ¶ 27. Defendants also advise consumers that they will save a specific amount of money, usually in the thousands of dollars. Id. According to the FTC, any representation that Defendants are able to procure a permanent reduction in monthly payments is false or unsubstantiated because IDR programs do not guarantee a fixed payment amount for more than one year. Id. ¶ 31. Further, given that IDR payments fluctuate over time based on income, any representation as to the specific amount that consumers will save is misleading. Id.
It is further alleged that Defendants make false or unsubstantiated representations to consumers about their eligibility for IDR programs based on inaccurate family size and income information. Id. ¶ 28. For example, Defendants counsel consumers to inflate their family size on the IDR application. Id. In a recorded call, one sales representative stated:
Now, support includes any kind of money - gifts, loans, housing, food, clothing, car, medical or dental, payment of college costs. Do you help anybody - if you have somebody on your cell phone plan; if you have somebody on your gym membership, they're considered part of your family. And we just had Christmas. You know, if you bought presents, clothes, watch, earrings, toilet paper, they're a part of your family.
Id. In reality, however, "family size" is determined "by counting the borrower, the borrower's spouse, and the borrower's children ... if the children receive more than half their support from the borrower." Id. ¶ 29 (quoting 34 C.F.R. § 682.215(a)(3) ). It may also include "other individuals if, at the time the borrower certifies family size, the other individuals - (i) Live with the borrower; and (ii) Receive more than half their support from the borrower and will continue to receive this support from the borrower for the year the borrower certifies family size." Id. (quoting *1074 34 C.F.R. § 682.215(a)(3) ). As a result, consumers may be enrolled in programs for which they do not qualify. Id. ¶ 30.
After consumers agree to enroll in a program and turn over their payment information, Defendants email a link to a lengthy contract that consumers are required to sign electronically. Id. ¶ 32. As consumers remain on the phone, Defendants pressure them to quickly click through the documents and electronically sign multiple pages. Id. In some instances, Defendants represent that the consumer not need read the agreement carefully because the information contained in the contract was already discussed in the call. Id. At the end of the call, consumers are transferred to the Verification Department and are quickly read lengthy disclosures. Id.
As stated above, Defendants charge consumers an advance fee for "document preparation" ranging from $600 to $800, which they generally collect over one to six installments before attempting to enroll consumers in any federal program. Id. ¶ 33.
2. Marketing of "Financial Education" Memberships
In addition to charging advance fees, Defendants also charge consumers a monthly fee for the life of their loan. Compl. ¶ 34. The monthly fee ranges from $49 to $99. Id.
Defendants represent that the monthly fee will be used to pay down consumers' loans. Id. For example, after reciting a consumer's loan balance, pay off amount, and estimated savings in the program, Defendants told a consumer, "Your quote based on your current situation is $255 for 1 month then it would drop down to $235 for an additional 6 months then it will be $99 for the remainder of your loan term, if your situation stays the same, which would be 25 years." Id., Ex. F (email to consumer).
In fact, Defendants apply the monthly fee toward a membership in their "financial education" program. Id. ¶ 35. The membership fees, which agents rarely discuss during sales calls, are used to pay for access to various resources unrelated to consumers' student loans. Id. Such services include "Key Ring & Luggage Protection," "Everyday Grocery Savings," "Auto Buying Service and Maintenance Discounts," "Financial Calculators," and more. Id.& Ex. G (contract excerpts). Documentation regarding the membership services often is buried in the middle of numerous documents Defendants provide to consumers. Id., & Ex. H (consumer documents) at H-17. In addition to the monthly membership fee, Defendants charge consumers an enrollment fee for the "financial education" program that ranges from $100 to $1,300. Id. ¶ 35.
Defendants' collection notices further reinforce their representations that consumers' monthly payments are going toward their student loans. Id. ¶ 36. If a consumer misses a monthly payment for the "financial education" program, Defendants send a notice stating, "* * * YOUR FILE IS CURRENTLY ON HOLD* * * " and "RE: Student Loan Payment. " Id., Ex. I (consumer notice). Defendants often refuse to provide refunds or provide only partial refunds that are substantially less than consumers paid. Id. ¶ 37.
3. Role of Defendant Frere
The Complaint alleges that Frere, acting alone or in concert with others, "formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the [Companies], including the acts and practices set forth in [the] Complaint." Compl. ¶ 38. Frere founded and incorporated AFBC, Ameritech, and FEBC. Id. ¶¶ 39-41. He is the majority owner of each entity, and has served as the CEO, Secretary, CFO and sole Director of *1075 each entity since its incorporation. Id. Frere has signed contracts with consumers as the "Managing Director" of AFBC. Id. ¶ 39. He has also been the signatory on AFBC and Ameritech's depository bank accounts. Id. ¶ 42.
In late 2015, Frere submitted an application to the Better Business Bureau ("BBB") serving Northeast California seeking accreditation for Ameritech. Id. ¶ 43. In June 2016, the BBB sent Frere a letter describing customer complaints, including complaints that customers were "scammed" and led to believe that their payments to the company were applied toward their student loan balances. Id. The BBB continued to express concerns about Ameritech's business practices until June 2017, when Ameritech advised the BBB that it was closing its office in the Sacramento area. Id.
As the "owner, high-ranking corporate officer, and active participant in the daily activities of the [Companies]," Frere allegedly "knew that the [Companies'] representations to consumers were false or unsubstantiated, was recklessly indifferent to the truth or falsity of such representations, or was aware of a high probability that the representations were fraudulent and intentionally avoided the truth." Id. ¶ 44.
D. PROCEDURAL HISTORY
The FTC initiated the instant consumer fraud action on February 7, 2018. Dkt. 1. The Complaint alleges claims for: (1) Violations of the FTC Act - Deceptive Student Loan Debt Relief Representations; (2) Violations of the TSR - Advance Fee for Debt Relief Services; and (3) Violations of the TSR - Material Debt Relief Misrepresentations. Id. The FTC seeks injunctive and other equitable relief, as well as monetary relief in the form of restitution, refund of monies paid, and disgorgement of ill-gotten monies. Id.
On March 2, 2018, the FTC filed a motion for preliminary injunction, which was set for hearing on May 9. Dkt. 22. On April 23, 2018, Defendants filed the instant motion to dismiss, which was set for hearing on June 13. Dkt. 117. The Court issued an order to coordinate scheduling in this and a related action and set both motions for hearing on June 13. Dkt. 122.[2] The Court referred the action for an early settlement conference. Dkt. 126.
On June 11, 2018, the Court took the motion for preliminary injunction and motion to dismiss under submission. Dkt. 138. Thereafter, the action did not settle, and the parties filed several administrative motions concerning the motion for preliminary injunction, including Defendants' motion to consider additional evidence or, in the alternative, hold an evidentiary hearing. See Dkt. 139, 140, 141, 144, 146. The motion for preliminary injunction and related administrative motions will be addressed in a separate order.
II. LEGAL STANDARD
A. RULE 12(B)(6)
Federal Rule of Civil Procedure 12(b)(6)"tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013). In assessing the sufficiency of a complaint, the *1076 court is to "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." Outdoor Media Group, Inc. v. City of Beaumont, 506 F.3d 895, 899-900 (9th Cir. 2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.
B. RULES 8(A) & 9(B)
Generally, pleadings must contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When alleging fraud, however, "a party must state with particularity the circumstances constituting fraud ...." Id. 9(b). "Rule 9(b) demands that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct ... so that they can defend against the charge and not just deny that they have done anything wrong." Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009) (quotation marks and citations omitted). "Averments of fraud must be accompanied by 'the who, what, when, where and how' of the misconduct charged.' " Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997) (internal quotation marks omitted) ). To satisfy Rule 9(b)'s specificity requirement, a plaintiff must allege the content of the false representations. Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (quotation marks and citation omitted). In addition, " '[a] plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false.' " Vess, 317 F.3d at 1106 (quoting In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994), superseded by statute on other grounds ).
III. DISCUSSION
Defendants move to dismiss the Complaint on the grounds that: (1) Counts One and Three sound in fraud but are not pled with the specificity required by Rule 9(b); (2) the Complaint fails to state a claim of individual liability against Frere; (3) the Complaint fails to state a claim under the TSR because it does not adequately allege that the Companies provide a "debt relief service"; and (4) Count Two fails to state a claim under the TSR because the Companies do not violate its advanced fee provisions.
A. FRAUD NOT PLED WITH SPECIFICITY [3]
Count One alleges that, in offering student loan debt relief services, Defendants *1077 represented, directly or indirectly, expressly or by implication, that (a) consumers' monthly payments to Defendants would be applied toward consumers' student loans, and (b) consumers were qualified for, or were approved to receive, loan forgiveness or other programs that would permanently lower or eliminate their loan payments or balances. Compl. ¶ 47. It is further alleged that, in truth or fact, such representations were false or unsubstantiated, and therefore constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act. Id. ¶¶ 48-49. Count Three makes the same substantive allegations, but sets forth a violation of Section 310.3(a)(2)(x) of the TSR.
Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). In order to establish a deceptive act or practice, the FTC must allege: (1) a representation, omission, or practice that, (2) is material, and (3) is likely to mislead consumers acting reasonably under the circumstances. FTC v. Stefanchik, 559 F.3d 924, 928 (9th Cir. 2009) (quoting FTC v. Gill, 265 F.3d 944, 950 (9th Cir. 2001) ). "Deception may be found based on the 'net impression' created by a representation." Id. (quoting FTC v. Cyberspace.Com LLC, 453 F.3d 1196, 1200 (9th Cir. 2006) ). Similarly, the TSR prohibits deceptive telemarketing acts or practices. 16 C.F.R. § 310.3(a). In particular, it is a deceptive act or practice for a seller or telemarketer to misrepresent, directly or by implication, any "material aspect of any debt relief service, including but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using such service ...." Id. § 310.3(a)(2)(x).
Defendants move to dismiss Counts One and Three on the ground that they sound in fraud but do not satisfy the heightened pleading standard of Rule 9(b). According to Defendants, the FTC's allegations of false or unsubstantiated representations "lack specificity and are untethered to any alleged fact or exhibit that provides support for these allegations." Mot. at 8. The Court disagrees.
The FTC alleges the content of the alleged misrepresentations and provides several examples of mailers or other communications containing such representations. Further, the FTC does not merely allege that the representations are false or unsubstantiated, but also explains why and how they are so. See DeVry, 2016 WL 6821112, at *5. For example, the FTC explains that the Companies' representations regarding fixed payments and total loan savings are false or unsubstantiated because monthly payment amounts fluctuate from year to year based on the borrower's income and family size, and thus, whether any portion of a borrower's loan will be forgiven, and if so, how much, cannot be determined. The allegations of the Complaint thus show that "the FTC's claims have a factual basis and provide Defendants with adequate notice as to the FTC's reasons for believing that [the representations] [are] unsubstantiated and materially false." Id., at *6. "Put another way, the FTC has identified the 'who' [the Companies, acting in a common enterprise, and Frere]; the 'what' [misrepresentations regarding loan savings and program fees]; the 'when' [2014 and onward]; the 'where' [throughout United States]; and the 'how' [by stating that monthly payments will remain fixed and certain sums be forgiven and that fees associated with the programs go toward loan balances]." Id." Rule 9(b) requires no more." Id.
In arguing to the contrary, Defendants contend that the allegations of the Complaint are insufficient because the FTC "misrepresents the content of the attached mailers." Mot. at 9. Specifically, the FTC alleges that "Defendants distribute *1078 mailers to consumers claiming that consumers are eligible for federal programs that would permanently reduce their monthly loan payments to a fixed amount or result in total loan forgiveness." Compl. ¶ 12. Defendants assert that, contrary to the FTC's allegations, the mailers "make a number of disclosures," including that: (1) the Companies provide "document preparation and processing services for a fee"; (2) the Companies "cannot guarantee warranty or predict the outcome in any particular situation"; and (3) a consumer "may apply on [his/her] own directly with the DOE for its services without fee." Mot. at 9 (quoting Compl., Ex. D-1). Quoting language such as, "this program can potentially save you thousands on your student loans and prepare you for Total Loan Forgiveness ...," Defendants further assert that the mailers make no "unequivocal" promises. Id. (quoting Ex. D-1). Defendants thus argue that the mailers "contradict" the allegations of the Complaint. Id.
As rightly argued by the FTC, Defendants' reliance on the mailers' "[f]ine-print disclosures" is unavailing, particularly at the pleading stage. Opp'n at 4. "A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures." Cyberspace.Com, 453 F.3d at 1200. "[A] disclaimer does not automatically exonerate deceptive activities." FTC v. Gill, 71 F.Supp.2d 1030, 1044 (C.D. Cal. 1999), aff'd, 265 F.3d 944 (9th Cir. 2001) ; see also FTC v. Medlab, Inc., 615 F.Supp.2d 1068, 1077 (N.D. Cal. 2009) ("Defendants cannot inoculate themselves from the representations that appear in the body of the text by including these cautionary statements at the foot of the advertisement."). Nor does the lack of an unequivocal promise preclude deception. See Gill, 71 F.Supp.2d at 1044 ("the lack of guarantee does not negate the misrepresentations" when a guarantee was "implied in the text"). Here, given the overall content of the mailers, the FTC adequately alleges one or more misrepresentations. See DeVry, 2016 WL 6821112, at *5 (denying motion to dismiss where defendants' advertisements "at least plausibly create[d]" a misleading impression).
Defendants further argue that "[o]ther generalized allegations also do not satisfy Rule 9(b)." Mot. at 9. For example, with regard to the alleged representation that consumers' monthly payments will be fixed for a certain period and, thereafter, the remaining balances forgiven, Defendants argue that the FTC "does not supply any details of specific representations to individual consumers." Mot. at 9-10. "Given that Defendants purportedly have engaged in their allegedly deceptive business for the past four years," they argue that it "strains credulity to believe that each encounter between Defendant's employees and the consumers involved identical interactions and identical representations." Id. at 10. The FTC is not required to allege "the specific representations" made to each individual consumer, however. Indeed, such a requirement would likely prove fatal to large-scale consumer protection actions. Likewise, "a plaintiff 'is not required to allege all facts supporting each and every instance' of allegedly fraudulent conduct." CFPB v. Prime Mktg. Holdings, LLC, No. CV 16-07111-BRO (JEMx), 2017 WL 2772313, at *13 (C.D. Cal. Jan. 19, 2017) (quoting Ebeid ex rel. U.S. v. Lungwitz, 616 F.3d 993, 999 (9th Cir. 2010) (internal quotation marks and citation omitted) ). It is sufficient that the FTC has provided "several examples of allegedly fraudulent statements." Id.
Defendants remaining arguments fare no better. Defendants argue that the FTC "cites only two supposed communications"-an email and a phone call-"between Defendants and a consumer." Mot. at 10. But the five mailers attached to the Complaint also constitute communications.
*1079 Defendants further argue that "[c]ertain allegations in the Complaint," such as the claim that consumers' incomes will rise over the years-long repayment period, "are sheer speculation." Id. This particular allegation does not itself allege fraud, but rather, explains why promises of fixed payments and total loan savings are unsubstantiated. The fact that "neither [the Companies] nor the FTC are able to predict the future" when it comes to consumers' income, id., is precisely the FTC's point. Defendants also point out that "[o]ther allegations," such as the allegation that the Companies often refuse to provide refunds, "are vague and do not allege fraud or deception." Id. The inclusion of potentially extraneous allegations does not mandate dismissal, however.
Finally, Defendants take issue with the allegation that their purportedly deceptive business practices have occurred "since 2014 and continuing thereafter." See Compl. ¶ 12. Defendants note that neither Ameritech nor FEBC was incorporated until October 2015. Defendants further note that two of the five mailers attached as exhibits to the Complaint (Exhibits A and B) predate the incorporation of Ameritech and FEBC. Defendants conclude: "Ameritech and FEBC cannot be liable for statements made prior to October 2015. Such allegations clearly do not meet the Rule 9(b) standard." Mot. at 11.
As an initial matter, where a common enterprise is alleged, allegations regarding the specific conduct of each corporate defendant are not required. FTC v. OMICS Grp. Inc., 302 F.Supp.3d 1184, 1195 (D. Nev. 2017) ("Under the common enterprise theory, Defendants' contention that the Complaint fails for not particularizing allegations to each Corporate Defendant is misplaced, as each are liable for the scheme as a whole."); FTC v. Johnson, No. 2:10-CV-02203-MMD, 2013 WL 2460359, at *5 (D. Nev. June 6, 2013) ("That the FTC does not allege with particularity the actual involvement of each shell entity in the common enterprise is not fatal."). Defendants do not challenge the allegation of a common enterprise. Thus, the FTC need not specify the conduct attributable to each entity.
As for the time period over which the conduct occurred, the FTC aptly observes that there is "a common-sense inference that [the Companies] were not part of the common enterprise to the extent they did not exist." Opp'n at 7. Indeed, the Complaint alleges deceptive practices spanning several years, which, by implication, originated with AFBC and later evolved to include Ameritech and FEBC. Although two of the mailers attached to the Complaint predate the incorporation of Ameritech and FEBC, the other three mailers do not, and at least one of them was sent as recently as 2017. The fact that the allegedly deceptive practices, and thus, some specific examples of the alleged misrepresentations, occurred prior to the incorporation of Ameritech and FEBC does not necessitate a dismissal where the Complaint otherwise alleges sufficient facts regarding these entities, their common enterprise, and the continuation of the challenged business practices.[4]
*1080 Accordingly, Counts One and Three adequately allege claims for deceptive business practices in violation of the FTC Act and the TSR.
B. INDIVIDUAL LIABILITY OF DEFENDANT FRERE
The Complaint alleges that Frere is personally liable for the Companies' deceptive business practices. Defendants move to dismiss the claims against Frere, arguing that the allegations are insufficient to establish his individual liability.
To obtain injunctive relief against an individual defendant, the FTC must establish that he "participated directly in the acts or practices or had authority to control them." FTC v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1170 (9th Cir. 1997) (citation omitted) ("[an individual's] assumption of the role of president of [a corporation] and her authority to sign documents on behalf of the corporation demonstrate that she had the requisite control"). To hold an individual liable for monetary damages, the FTC must also show that he "had actual knowledge of material misrepresentations, [was] recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of the truth." Id. at 1171 (citations omitted). Although fraud must be pled with specificity, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Circumstantial evidence regarding the individual's "degree of participation in business affairs is probative of knowledge." FTC v. Amy Travel Serv., Inc., 875 F.2d 564, 574 (7th Cir. 1989).
Here, the allegations of the Complaint are sufficient to support a claim of individual liability against Frere. In arguing to the contrary, Defendants rely almost exclusively on FTC v. Swish Marketing, No. C 09-03814 RS, 2010 WL 653486 (N.D. Cal. Feb. 22, 2010), which they contend involved allegations "remarkably similar" to those at issue in this case. Mot. at 11. As discussed below, however, the comparison is inapt. In Swish, the court found individual liability insufficiently pled where it was alleged only that (a) the individual defendant, Benning, was the CEO of the corporation; and (2) "[c]onsumers [had] filed complaints" with the defendants, the BBB, and law enforcement. Swish, 2010 WL 653486, at *5-6. Here, the allegations of the Complaint are more robust.
Specifically, in addition to allegations regarding Frere's founding, incorporation, and majority ownership of the Companies, it is alleged that he has served as the CEO, Secretary, CFO, and sole Director of each entity since its incorporation. Compl. ¶¶ 9, 39-41. He was also the signatory on AFBC's and Ameritech's bank accounts. Id. ¶ 42. Frere's founding of the Companies and assumption of all leadership roles therein evidences his involvement in both their high-level and day-to-day management. Frere also signed contracts with consumers as a "Managing Director." Id. ¶ 39. This further evidences his day-to-day involvement in the business and the very activities that form the basis of Defendants' liability. Finally, as a liaison to the BBB, Frere was advised of consumer complaints, including claims that consumers were wrongly led to believe that payments to the Companies were applied *1081 toward their loan balances. Id. ¶ 43. This tends to show that Frere was aware of consumer confusion caused by the Companies' representations.[5]
Thus, unlike in Swish, allegations regarding Frere's degree of participation in the Companies' business affairs are sufficient to support the inference that he knew of or was recklessly indifferent to the purported misrepresentations. See Swish, 2010 WL 653486, at *6 (dismissing the complaint, but noting that, "[a]dditional facts such as the number of consumers who complained directly to Benning, or the size and structure of Swish reflecting senior management involvement might render any amended complaint adequate"); see also OMICS Grp., 302 F.Supp.3d at 1193 (finding individual liability adequately alleged on motion for preliminary injunction where the defendant was the founder, principal, and owner of the corporate defendants, had signatory authority over their financial accounts, and served as the "CEO and Managing Director" of the parent company). Indeed, the Swish court denied a subsequent motion to dismiss after the FTC amended its complaint to allege, among other things, that Benning served as one of only three corporate directors and received emails regarding customer complaints. FTC v. Benning, No. C 09-03814 RS, 2010 WL 2605178, at *2, 5-6 (N.D. Cal. June 28, 2010).[6]
Accordingly, at this stage of the litigation, the allegations of the Complaint are sufficient to support a claim of individual liability against Frere.
C. APPLICABILITY OF THE TSR
The TSR prohibits deceptive or abusive telemarketing acts or practices, including certain acts or practices by sellers or telemarketers of any "debt relief service." 16 C.F.R. §§ 310.3(a)(2)(x) & 310.4(a)(5)(i). Counts Two and Three of the Complaint allege that Defendants engage in such abusive or deceptive acts or practices by, respectively, (a) requesting or receiving advance fees for any debt relief service, and (b) misrepresenting material aspects of any debt relief service.
Defendants move to dismiss Counts Two and Three on the ground that the FTC has not adequately alleged that the Companies provide a "debt relief service." Defendants argue that, although the Complaint "summarily contends" that the Companies provide debt relief services, the mailers attached thereto demonstrate that they merely provide document preparation and processing services for a fee. Mot. at 12; id. at 13 (citing Compl. Ex A-1 ("AF Student Services provides document preparation and processing services for a fee."), Exs. C & D-1 ("Company provides document preparation and processing services for a fee.") ). Relying on FTC v. PSC Administrative, LLC, No. CV 15-0084-WS-B, 2016 WL 3406113, at *10 (S.D. Ala. June 17, 2016), Defendants assert that the FTC's "failure to address these disclaimers *1082 and adequately describe the Companies' businesses requires dismissal of the TSR claims." Mot. at 13. Defendants' argument is without merit.
The TSR defines a debt relief service in "broad terms." CFPB v. IrvineWebWorks, Inc., NO. SACV 14-1967 JVS, 2016 WL 1056662, at *6 C.D. Cal. Feb. 5, 2016. Specifically, a "debt relief service" encompasses "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector." 16 C.F.R. § 310.2(o). Defendants' services fall within this definition, as they purport to alter the terms of payment or other terms of consumers' debt. Indeed, as alleged by the FTC, Defendants represent their services as "Student Loan Payment Reduction & Forgiveness." Compl. Ex. C; id. Exs. D-1 & E-1; see also id. Ex. B-1 ("Due to the current status of your student loans, your pre-qualification may allow you to reduce your current monthly payments of approximately $480 down to as low as $60, and you may also qualify for complete 100% total loan forgiveness with other available programs.").
Defendants' characterization of their services as mere document preparation and processing, to the exclusion of any service defined as debt relief under the TSR, is unavailing. Although Defendants' mailers label their services as "document preparation and processing services for a fee," the FTC rightly notes that the fine-print disclaimers cited by Defendants only appear after the mailers have advertised the aforementioned loan forgiveness and payment reduction services. Moreover, the language of the disclosures does not contradict the mailers' broader representations regarding the services offered. While Defendants now imply that document preparation and processing services are necessarily discrete from any debt relief service, that assertion is unsupported and, in fact, belied by the Companies' own representations. See Compl., Ex. A-1 ("You have been Pre - Qualified to reduce your student loan payments through the Student Loan Document Preparation and Processing Services Program.") (emphasis added).
In view of the forgoing, Defendants' reliance on PSC Administrative is likewise unavailing. Defendants rely on that case in support of the proposition that the FTC inadequately addresses the "threshold, 'debt relief service' issue." Reply at 8-9 (quoting PSC Administrative, 2016 WL 3406113, at *10 ). But for purposes of the pleading stage, the FTC adequately alleges facts showing that Defendants are sellers or telemarketers of debt relief services. Cf. PSC Administrative, 2016 WL 3406113, at *10 (denying the FTC's motion for summary judgment on the ground that it had not adequately shown that the defendants represented their payday loan validation services-which did not actually renegotiate, settle, or otherwise alter the terms of the loans-as a debt relief service). The Complaint and the exhibits attached thereto allege facts that, on their face, fall within the debt relief provisions of the TSR. The FTC need not allege anything further.
Finally, other courts have found that similar "student loan debt relief" operations fall under the purview of the debt relief provisions of the TSR. See, e.g., IrvineWebWorks, 2016 WL 1056662, at *2, 6-7 (finding that the defendant provided debt relief services subject to the TSR where it purported "to assist consumers identify and apply for various Department of Education repayment plans, ensure proper assignment in federal programs, *1083 and help consumers meet recertification requirements"). In so finding, the court noted that the TSR's debt relief service provisions were designed to combat the very harms that the defendant's practices were likely to inflict, and that the policies behind the debt relief provisions thus applied to cover the defendant's services. Id., at *6-7 & n.3 (quoting 75 Fed. Reg. 48458 at 48484-5 ("In many cases, providers misrepresent or fail to disclose material aspects of their programs, causing consumers to make payments to the providers for several months, not realizing that most of the payments go toward fees, rather than settlement offers.") ). The same is true here, where it is alleged that Defendants misrepresented or failed to disclose material aspects of their programs, causing consumers to believe that payments to the Companies were being applied toward their loan balances.
Accordingly, the Complaint adequately alleges that the Companies provide "debt relief services."
D. ADVANCE FEE VIOLATIONS
Defendants further argue that, even if the TSR applies, Count Two should be dismissed because the Companies did not violate the TSR's advance fee provision. As discussed below, this argument is unavailing.
The TSR prohibits sellers and telemarketers from engaging in abusive telemarketing acts or practices, including "requesting or receiving payment of any fee or consideration for any debt relief service" until certain conditions are met. 16 C.F.R. § 310.4(a)(5)(i). Provided that various safeguards are utilized, however, the TSR does not prohibit sellers or telemarketers from "requesting or requiring the customer to place funds in an account to be used for the debt relief provider's fees and for payments to creditors or debt collectors in connection with the renegotiation, settlement, reduction, or other alteration of the terms of payment or other terms of a debt." Id. § 310.4(a)(5)(ii). The TSR requires that: (A) the funds are held in an account at an insured financial institution; (B) the customer owns the funds and is paid any accrued interest; (C) the entity administering the account is not owned or controlled by, or in any way affiliated with, the debt relief service; (D) the entity administering the account does not give or accept any money or other compensation in exchange for referrals of business involving the debt relief service; and (E) the customer may withdraw from the debt relief service at any time without penalty, and must receive all funds in the account, less any funds earned by the debt relief service in compliance with § 310.4(a)(5)(i). Id. [7]
Defendants argue that, although "[t]he FTC alleges that the Companies obtain payment up front, Exhibit G shows that the funds are held by a third party at an FDIC-insured financial institution. See Ex. G. at G-8. It is indisputable that the TSR permits companies to require the consumer to deposit funds into an escrow account to be used to pay fees, so long as certain safeguards are in place. Those include use of a third party escrow account." Mot. at 15 (emphasis added). Exhibit G contains consumer contract excerpts that include the following language: "Dedicated *1084 Savings Account: Member understands that Member is solely in control of all savings funds for the purpose of paying the fees due for the Membership Plan. Member will designate an account for program savings funds and such dedicated account is independent from FEBC." Compl., Ex. G-8 (emphasis in original).
As set forth above-and implicitly acknowledged by Defendants-use of a third party escrow account is but one of several requirements imposed by the TSR. Setting aside the questions of whether escrow accounts were established for each consumer and for all advanced fees charged by the Companies (not just "the fees due for the Membership Plan"), Exhibit G falls short of establishing that the Companies satisfy all of the requirements of the TSR.[8] Of particular note is the allegation that Defendants often do not provide refunds to consumers upon demand. Exhibit G therefore does not contradict the Complaint's allegation of advance fee violations.
Accordingly, Defendants have not shown that Count Two is subject to dismissal.
IV. CONCLUSION
For the reasons stated above, IT IS HEREBY ORDERED THAT:
1. Defendants' motion to dismiss is DENIED.
2. This Order terminates Docket 117.
IT IS SO ORDERED.

The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Fed. R. Civ. P. 78(b) ; N.D. Cal. Civ. L.R. 7-1(b).

On August 19, 2017, the Companies filed a declaratory relief action against the FTC. American Financial Benefits Center v. FTC, Case No. 17-cv-04817-SBA, Dkt. 1. Upon the filing of the instant action, the Court deemed the two actions related. Id., Dkt. 38. On May 29, 2018, the Court dismissed the Companies' declaratory relief action for lack of subject matter jurisdiction. Id., Dkt. 51. The Companies have appealed. Id., Dkt. 53.

"Courts within the Ninth Circuit and elsewhere are split as to whether Rule 8 or Rule 9(b) applies to claims brought under Section 5 of the FTC Act." FTC v. DeVry Educ. Grp., Inc., CV-16-00579-MWF-SSx, 2016 WL 6821112, at *3 (C.D. Cal. May 9, 2016) (compiling cases); see also FTC v. Wellness Support Network Inc., No. C-10-04879 JCS, 2011 WL 1303419, at *8 (N.D. Cal. Apr. 4, 2011). As rightly asserted by the FTC, resolution of the instant motion does not require the Court to decide which rule applies because, as explained below, the allegations here satisfy both the general and heightened pleading standards. See, e.g., DeVry, 2016 WL 6821112, at *3 (declining to reach the issue); Wellness Support Network, 2011 WL 1303419, at *9 (same). The Court therefore assumes without deciding that the heightened pleading standard of Rule 9(b) governs.

Indeed, in the related action, the Companies explicitly alleged that FEBC and Ameritech were formed in 2015 in an attempt to avoid running afoul of the TSR. First Am. Compl. ¶¶ 20-22, Dkt. 19, Case No. 17-cv-04817-SBA. Prior to FEBC and Ameritech's incorporation, AFBC had provided consumers with both the student loan processing services and the supplemental membership benefits. Id. ¶ 20. FEBC and Ameritech were formed in order to separate those services, such that the membership program could "be characterized as an optional external upsell under the TSR." Id. ¶ 22. Thus, it can reasonably be asserted that the incorporation of the entities was done for the very purpose of continuing the business practices that are now challenged by the FTC as deceptive. Whether the Companies succeeded in structuring their businesses in a manner that achieves compliance with the law remains to be seen, and the Court expresses no opinion on that matter at this juncture. However, it is clear that the Companies' business practices are sufficiently intertwined such that the allegation of events occurring prior to FEBC and Ameritech's incorporation is generally permissible.

Although Frere asserts that there is no evidence he received or responded to the BBB's communications, such factual matters are not properly resolved on a motion to dismiss. Benning, 2010 WL 2605178, at *5.

The only other authorities cited by Defendants were decided at later stages of the litigation. See Mot. at 12 (citing Publ'g Clearing House, 104 F.3d at 1171 (affirming summary judgment); Amy Travel Service, 875 F.2d at 573-75 (affirming judgment after trial) ). It is therefore unsurprising that claims of individual liability were supported by additional evidence in those actions. E.g., Amy Travel Service, 875 F.2d at 574-75 (wherein the court noted that, in addition to being the principal shareholders and officers of the closely held corporations, the individual defendants wrote the deceptive sales scripts and were aware of a high volume of customer complaints and chargebacks).

Sellers and telemarketers must also "disclose truthfully, in a clear and conspicuous manner" that "the customer owns the funds held in the account, the customer may withdraw from the debt relief service at any time without penalty, and if the customer withdraws, the customer must receive all funds in the account, other than funds earned by the debt relief service in compliance with § 310.4(a)(5)(i) [ ]." 16 C.F.R. § 310.3(a)(1)(viii)(D). Failure to make such disclosures constitutes a deceptive telemarketing act or practice. Id.

In their reply, Defendants add that they "clearly disclosed the consumer's ownership of the funds in the dedicated account." Reply at 10. Setting aside the questions of whether Exhibit G's language is clear and conspicuous and included in all consumer contracts, however, the Court notes that the language fails to fully satisfy the TSR's disclosure requirements. As set forth above, the seller or telemarketer must not only advise consumers of their ownership of the funds, but must also advise them of their right to withdraw from the debt relief service at any time without penalty and to be returned the funds. 16 C.F.R. § 310.3(a)(1)(viii)(D). The cited contractual language does not include all of the requisite disclosures.